651 So.2d 1068 (1995)
Glenda Marie Hall Moore ELLIS
v.
Bernard Hopkins ELLIS.
No. 93-CA-00968-SCT.
Supreme Court of Mississippi.
March 9, 1995.
*1069 H.J. Davidson, Jr., Carter & Davidson, Columbus, for appellant.
John W. Crowell, William T. Cooper, Gholson Hicks Nichols & Ward, Columbus, for appellee.
Before HAWKINS, C.J., and JAMES L. ROBERTS, Jr. and SMITH, JJ.
JAMES L. ROBERTS, Jr., Justice, for the Court:

FACTS
After twenty years of marriage, a marital separation was culminated by the granting of a divorce based on irreconcilable differences. In the separation agreement made part of the decree, the parties provided for the custody and support of the minor child, disposition of their property, and alimony payments by Dr. Bernard Hopkins Ellis to Glenda Marie Hall Moore Ellis. Bernard agreed to pay alimony to Mrs. Ellis in the sum of $175 per week and to continue this sum until the primary residence of the parties was sold, whereupon it would increase to $750 per month. The agreement further provided that alimony was to terminate upon the wife's death or remarriage, or the husband's death, and provided that the alimony shall not be modified without consent and agreement of the parties.
Bernard filed a motion to modify the divorce decree, alleging a material change of circumstances. The chancellor reduced alimony payments to $375 a month for six months but terminated alimony at the end of the six months due to Glenda's "misconduct" based on her post-marital relationship with a man it referred to as "Smith".
At a hearing for a motion to modify filed by Bernard, Bernard presented evidence that Glenda had engaged in sexual misconduct with a man subsequent to the divorce decree. Bernard had ceased alimony payments on this basis.
Testimony from the modification hearing is summarized below.

Bernard Ellis
Bernard first testified that he agreed to pay Glenda periodic alimony of $175.00 a week until the marital residence was sold, whereupon alimony would increase to $750.00 a month. He stated that he wished to terminate alimony or in the alternative, reduce the amount of alimony to a sum that he could afford to pay. Bernard based this on his semi-retirement from his psychiatric practice, health, and Glenda's relationship with Smith.
Bernard testified that since the divorce decree was entered he had experienced hypertension, congestive heart failure, bypass heart surgery, cataract surgery, and high blood pressure. He explained that he was sixty-eight years old and had been practicing medicine for thirty-three years. Bernard testified that he resigned from the Community Counseling Hospital, which reduced his income to approximately $90,000 a year. He testified that he also had to reduce the number of counties he "covered" for Community Counseling because of arteriosclerosis in his legs which caused "clogged" arteries and thus reduced the number of miles he could drive.
Bernard testified that he had a gross monthly income of $6,050.00, with payroll deductions for social security ($765.00), state tax ($200.00), and federal tax ($1200.00) which left him with a net monthly income of $3,885.00. Bernard stated that his current monthly bills include a house payment ($878.00); food, transportation, house supplies, ($1,011.00); medicare and insurance ($143.00); utilities, laundry, maid, and yard work ($262.00). This leaves a balance of $1,082.00. Bernard testified that he retained the marital residence when the divorce decree was entered.
Bernard admitted on cross that he reduced his workload to "stop and smell the roses" and because of problems at work. He also admitted that in his April 14, 1993, deposition that he stated that he was in "perfect physical health". Bernard owned two lots during *1070 the marriage and purchased three more lots from his son Steve Ellis after the divorce. He sold the marital residence to Steve for $90,000 but it had been appraised for $150,000. He also bought Steve's home for $54,000 and had no payments on the home. He stated that he had a new roof put on the marital residence at a cost of $7,000 and plumbing repairs of $300 to $400. He currently lives in a home he purchased from Callie S. McGraw for $31,500. He also paid for repairs on that home totaling $7,000. Bernard also stated that he purchased a 1991 Toyota for $18,000.

Hubert Chandler
Hubert Chandler is a former military policeman with the United States Air Force and former Detective with the Columbus Police Department. He currently works as a private investigator.
Chandler conducted surveillance on the residence of Glenda Ellis and took photographs of the residence on several occasions. The photographs reveal Glenda's car and Smith's truck parked in the driveway. Chandler also took extensive notes on every occasion that he surveilled the residence which indicated that he started surveillance on July 5, 1991, and continued through December 5, 1991. He testified that Smith spent the night at Glenda's residence several times a week. Chandler ended surveillance in December of 1991 and resumed surveillance in June of 1992.
On cross, Chandler testified that Smith had an apartment at Candlewood Apartments. He testified he never saw Smith bringing clothes in or out of Glenda's residence but he opined that Smith really lived at Glenda's home because he spent more time there than at his own apartment. Chandler stated that starting in November of 1991, Smith regularly left Glenda's residence at approximately 11:00 p.m.

Glenda Ellis
Glenda was called adversely and testified that she had a sexual relationship with Smith. She further testified on direct that she was unemployed because the company she worked for closed and that she has attempted to obtain employment but one problem was that employers was concerned about upsetting Bernard Ellis. Glenda stated that she had not received child support from Bernard because their son, Lydle Ellis, was emancipated but she had supported Lydle when he needed money. She testified that she receives unemployment of $660 with expenses of $1,111.40, which included house payment, food, clothing, transportation, medical and dental, utilities, laundry, telephone bill, and life insurance.[1] She testified beginning in November of 1991 that "Smith" began leaving her house around 11:00 p.m. and they were no longer having a sexual relationship. She testified that "Smith" was terminated from his job and that he does not receive any mail at her home or keep any clothes or other miscellaneous items there. She stated that "Smith" has not made any type of payment for her which includes house payments, utility bills, and does not look to him for support. She testified on cross that she has about $2,400 in her checking account, 180 shares of Deposit Guaranty, 100 shares of MicroTech, and a $10,000 silver savings. She testified that she received $60,000 as part of the property settlement. She used the $60,000 in the following manner: $10,000 to pay her car off, $10,000 on her house, $20,000 in a certificate of deposit.[2]
The Chancellor found that Glenda "sought many of the attributes of a marriage without the loss of her ex-husband's duty of continued support as alimony." The Chancellor further found that Glenda had chosen to forego her marriage vows to sanction her sexual relationship. The Chancellor held that Bernard's obligation to support Glenda did not include supporting her relationship with Smith. Specifically, the Chancellor held that public policy prevented this obligation. The public policy grounds delineated by the chancellor include favoring marriage and abstinence from sex outside of marriage. The Chancellor held that Glenda has $10,000 in savings and draws unemployment benefits of *1071 $660.00 per month, with living expenses of approximately $1100.00 per month. In sum, the Chancellor held that under the totality of the circumstances, which include Bernard's reduced income (due to his partial retirement for health reasons) and Glenda's misconduct, the alimony must be reduced to $375.00 per month for six months and thereafter terminated due to Glenda's misconduct.
Glenda appealed, citing the following errors:
I. CLAIMANT'S PROOF WAS INSUFFICIENT AS A MATTER OF LAW TO JUSTIFY THE CHANCELLOR IN TERMINATING THE ALIMONY PAYMENTS.
II. MRS. ELLIS CLEARLY SHOWED BY HER PROOF THAT ANY RELATIONSHIP WITH ANOTHER MAN HAD BEEN SUBSTANTIALLY TERMINATED PRIOR TO THE DATE OF THE FILING OF THE PETITION, WHICH UNDER CURRENT LAW WOULD JUSTIFY THE CHANCELLOR IN NOT TERMINATING THE ALIMONY. THE CHANCELLOR ERRED IN TERMINATING THE ALIMONY.
III. THAT TO TERMINATE THE ALIMONY IN THIS FASHION BASED UPON AN ALLEGATION OF "MISCONDUCT" IS AN UNNECESSARY AND UNACCEPTABLE RESTRICTION ON ANY PARTY TO EXERCISE THEIR CONSTITUTIONAL RIGHTS TO LIFE, LIBERTY, AND THE PURSUIT OF HAPPINESS. THE CHANCELLOR ERRED IN TERMINATING THE ALIMONY.
IV. MRS. ELLIS DEMONSTRATED BY HER EVIDENCE THAT THERE WAS SUBSTANTIAL ECONOMIC NEED ON HER PART, HAVING JUST LOST HER JOB, AND THE TERMINATION OF THE ALIMONY PAYMENTS WAS CONTRARY TO ESTABLISHED LAW IN THIS STATE AND OTHERS AND WAS GROSSLY UNFAIR AND INEQUITABLE. THE ECONOMIC NECESSITY ON THE PART OF MRS. ELLIS CLEARLY AND SUBSTANTIALLY OUTWEIGHED THE PROOF OF "MISCONDUCT" JUSTIFYING THE TERMINATION OF ALIMONY. THE CHANCELLOR ERRED IN THE ADMINISTRATION OF EQUITIES WHEN HE TERMINATED THE ALIMONY.
V. THE CHANCELLOR ERRED BY NOT RESPECTING THE PRIOR ORDER AND AGREEMENT OF THE PARTIES WHEREIN IT WAS AGREED AND SO ORDERED THAT THE ALIMONY PROVISIONS "SHALL NOT BE MODIFIED WITHOUT CONSENT AND AGREEMENT OF THE PARTIES."

DISCUSSION OF THE ISSUES

I. CLAIMANT'S PROOF WAS INSUFFICIENT AS A MATTER OF LAW TO JUSTIFY THE CHANCELLOR IN TERMINATING THE ALIMONY PAYMENTS.
The first error addresses the issue that Bernard's proof was insufficient as a matter of law to justify the Chancellor in terminating the alimony payments. This error is based upon the contention that the facts are distinguishable in the case at bar, from the cases cited by the Chancellor. See Owen v. Gerity, 422 So.2d 284 (Miss. 1982); McHann v. McHann, 383 So.2d 823 (Miss. 1980); McRae v. McRae, 381 So.2d 1052 (Miss. 1980); Rubisoff v. Rubisoff, 242 Miss. 225, 133 So.2d 534 (1961).
The standard of review in determining the weight of the evidence has been well established by this Court and it will not "disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Crow v. Crow, 622 So.2d 1226 (Miss. 1993); Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990). Therefore, this issue is without merit.
However, the recent Hammonds opinions reflect the issue of termination of alimony payments. See Hammonds v. Hammonds, 641 So.2d 1211 (Miss. 1994) and Hammonds v. Hammonds, 597 So.2d 653 (Miss. 1992). These opinions discussed past cases which addressed the issue of whether a wife's post-divorce sexual relations or cohabitation may *1072 justify termination of alimony payments from her ex-husband. The Hammonds opinion states that the McRae, McHann and Owen cases "clearly reflect a moral judgment that a divorced woman should not engage in sexual relations; the penalty for such activity is forfeiture of her right to support from her ex-husband." Hammonds at 1216. However, the Hammonds court noted that a divorced payee spouse engaging in sex was not a per se basis for modifying or terminating alimony but that additional financial inquiries were needed as well. Hammonds at 1216.
In Hammonds, the question was the effect of post-divorce cohabitation by the recipient of alimony on her right to alimony. Id. at 1214-1215. The Hammonds Court applied the test for modification of spousal support: whether there has been a material or substantial change in circumstances since the divorce. Id.; citing Tingle v. Tingle, 573 So.2d 1389, 1391 (Miss. 1990); Morris v. Morris, 541 So.2d 1040, 1043 (Miss. 1989). In a departure from past cases holding that subsequent sexual misconduct may result in forfeiture of support, the Hammonds Court remanded for a determination of whether Linda Hammonds was receiving support from cohabitation with another man and whether her financial needs had changed as a result. Hammonds at 1217.
In the case at bar, it is unclear whether Glenda Moore Ellis cohabitated with another man although she had substantial contact with him for a long period of time and he was a frequent overnight guest.[3] Even if one finds that Glenda did cohabit with another man, Hammonds requires remand for a determination of whether she receives support from him.
In the case at bar, "Smith" is unemployed and has been so for some time. But, this raises an issue that this Court has not had the occasion to consider (and one that Bernard has not specifically addressed in his brief): Would Hammonds also require remand to consider the issue of whether Glenda supports "Smith"?[4] The approach in Hammonds follows the modern trend in most jurisdictions. Therefore, on remand, two factors are to be considered by the Chancellor: (1) whether the third party provides support to the recipient (discussed above); and (2) whether the recipient spouse contributes to the support of a third party. Maclaren v. Maclaren, 616 So.2d 104 (Fla. App. 1 Dist., 1993); DePoorter v. DePoorter, 509 So.2d 1141 (Fla.App. 1 Dist., 1987), (where an ex-wife cohabited with another man after dissolution of a 28 year marriage, the court held that cohabitation raised a presumption of changed circumstances but by itself did not require reduction of alimony); Melletz v. Melletz, 271 N.J. Super. 359, 638 A.2d 898 (1994), (where the separation agreement required suspension of alimony payments if the wife cohabitated with an unrelated male, the court refused to apply the "contract" language as it conflicted with the public policy of guaranteeing privacy to individuals and did not by itself demonstrate a need for reduction of alimony).
Naturally, Bernard did not raise the issue as to whether Glenda supports "Smith", as he could not anticipate the direction this Court would follow in this area. In order to properly resolve all the relevant issues, this Court remands for a determination on this issue.

II. MRS. ELLIS CLEARLY SHOWED BY HER PROOF THAT ANY RELATIONSHIP WITH ANOTHER MAN HAD BEEN SUBSTANTIALLY TERMINATED PRIOR TO THE DATE OF THE FILING OF THE PETITION, WHICH UNDER CURRENT LAW WOULD JUSTIFY THE CHANCELLOR IN NOT TERMINATING THE ALIMONY. THE CHANCELLOR ERRED IN TERMINATING THE ALIMONY.
The second error asserted by Glenda concerns whether she terminated her relationship *1073 with the other man prior to the date of the filing of the petition, which justifies the chancellor in not terminating the alimony. In light of the previous discussion of the Hammonds case, this point need not be addressed because whether Glenda terminated the relationship or not, the crux of the issue under Hammonds is whether she received support from him. Of course, whether Glenda provides support to "Smith" is also to be considered.

III. THAT TO TERMINATE THE ALIMONY IN THIS FASHION BASED UPON AN ALLEGATION OF "MISCONDUCT" IS AN UNNECESSARY AND UNACCEPTABLE RESTRICTION ON ANY PARTY TO EXERCISE THEIR CONSTITUTIONAL RIGHTS TO LIFE, LIBERTY, AND THE PURSUIT OF HAPPINESS. THE CHANCELLOR ERRED IN TERMINATING THE ALIMONY.
The next error Glenda asserts is that termination of alimony based upon misconduct is an unnecessary and unacceptable restriction on any party to exercise their constitutional rights to life, liberty, and the pursuit of happiness. The merits of this assigned error will not be reached for several reasons. First, Glenda failed to cite any authority in support of this error and this Court has consistently held that an unsupported assignment of error will not be considered. Townsend v. Estate of Gilbert, 616 So.2d 333 (Miss. 1993); Clark v. State, 503 So.2d 277 (Miss. 1987); Hunter v. State, 489 So.2d 1086 (Miss. 1986); Kelly v. State, 463 So.2d 1070 (Miss. 1985). Moreover, Glenda raised this issue for the first time on appeal and this Court has also consistently held that errors raised for the first time on appeal will not be considered, especially where constitutional questions are concerned. Patterson v. State, 594 So.2d 606, 609 (Miss. 1992); Contreras v. State, 445 So.2d 543, 544 (Miss. 1984); Smith v. State, 430 So.2d 406, 408 (Miss. 1983).

IV. MRS. ELLIS DEMONSTRATED BY HER EVIDENCE THAT THERE WAS SUBSTANTIAL ECONOMIC NEED ON HER PART, HAVING JUST LOST HER JOB, AND THE TERMINATION OF THE ALIMONY PAYMENTS WAS CONTRARY TO ESTABLISHED LAW IN THIS STATE AND OTHERS AND WAS GROSSLY UNFAIR AND INEQUITABLE. THE ECONOMIC NECESSITY ON THE PART OF MRS. ELLIS CLEARLY AND SUBSTANTIALLY OUTWEIGHED THE PROOF OF "MISCONDUCT" JUSTIFYING THE TERMINATION OF ALIMONY. THE CHANCELLOR ERRED IN THE ADMINISTRATION OF EQUITIES WHEN HE TERMINATED THE ALIMONY.
The next error Glenda asserts on her appeal alleges substantial economic need on her part and termination of the alimony payments was contrary to established law and inequitable. Glenda further alleges that her economic necessity substantially outweighed the proof of misconduct and thus, the chancellor erred in the administration of equities when he terminated the alimony. Again, Glenda cites no authority for this alleged assignment of error and this Court has explained that it will not consider an unsupported assignment of error. Townsend at 333; et al. Additionally, our remand on the Hammonds issue precludes such a determination at this time.

V. THE CHANCELLOR ERRED BY NOT RESPECTING THE PRIOR ORDER AND AGREEMENT OF THE PARTIES WHEREIN IT WAS AGREED AND SO ORDERED THAT THE ALIMONY PROVISIONS "SHALL NOT BE MODIFIED WITHOUT CONSENT AND AGREEMENT OF THE PARTIES."
The last assignment of error that Glenda asserts is that the Chancellor erred by not respecting the prior order and agreement of the parties wherein it was agreed and ordered that alimony provisions shall not be modified without consent and agreement *1074 of the parties. However, this Court has explained that periodic alimony agreements incorporated into the court decree based on irreconcilable differences are subject to modification where a material change in circumstances arises. Gregg v. Montgomery, 587 So.2d 928, 931 (Miss. 1991); citing Lawrence v. Lawrence, 574 So.2d 1376, 1380 (Miss. 1991); Miss. Code Ann. § 93-5-23 (Supp. 1990) (allowed modifications of divorce decrees issued on grounds of irreconcilable differences). Thus, this issue is also without merit.
As noted in Hammonds at 1217, several states, including Alabama and Georgia, have so called "live-in lover" statutes which authorize courts to terminate or modify alimony where the party receiving it is living openly or co-habiting with a member of the opposite sex. See, e.g., Shapiro v. Shapiro, 259 Ga. 405, 383 S.E.2d 134 (1989); Ex parte O'Neill, 420 So.2d 264 (Ala. 1982). Unfortunately, Mississippi does not have such a statute despite the fact that cohabitation itself is illegal. Miss. Code Ann. (1972) § 97-29-1 (Supp. 1992). Our neighboring states of Tennessee and Louisiana have alimony termination statutes which should provide the legislature some guidance in this area. See, Cook v. Cook, 436 So.2d 743 (La. App. 1983); See Azbill v. Azbill, 661 S.W.2d 682 (Tenn. App. 1983). The legislature may wish to consider such examples.

CONCLUSION
Pursuant to Hammonds, we remand this case for further findings on whether Glenda is or has been cohabiting with "Smith", whether she is being supported by (or is supporting) him, and whether her financial needs have changed. The lower court's findings on these issues will determine whether or not a `material and substantial change in circumstances' has occurred such as to give rise to the level needed for a modification or termination of alimony. Therefore, the Chancellor may modify and/or terminate the alimony award on the basis of such findings.
REVERSED AND REMANDED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and SMITH, JJ., concur.
McRAE, J., concurs in result only.
NOTES
[1] The financial data was obtained from the Financial Data Form submitted by Glenda Ellis.
[2] The record is unclear as to what Glenda did with the other $20,000.
[3] The chancellor did not find in his order whether Glenda cohabitated with "Smith".
[4] Hammonds dealt with the issue of whether Linda Hammonds received support from Shane Cole, whom she was allegedly cohabiting with, however, the Court also remanded to determine if Linda was supporting him.