962 So.2d 618 (2006)
Jolee A. BURRUS, Appellant
v.
Ronald A. BURRUS, Appellee.
No. 2005-CA-00356-COA.
Court of Appeals of Mississippi.
December 12, 2006.
Rehearing Denied April 24, 2007.
*619 T. Jackson Lyons, Jackson, attorney for appellant.
Michael G. Piazza, Jackson, attorney for appellee.
Before MYERS, P.J., SOUTHWICK AND GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶ 1. Jolee A. Burrus appeals the chancellor's judgment that modified an earlier judgment of divorce. The chancellor ruled that Jolee's cohabitation with another man justified the termination of alimony payments owed by her former husband, Ronald A. Burrus. Also, the chancellor determined that custody of their children should be modified and primary custody granted to Ronald. On appeal, Jolee challenges these findings.

FACTS
¶ 2. Ronald and Jolee were married in 1982. They were divorced on April 10, *620 2003. In their judgment of divorce, they agreed to joint legal and physical custody of their three children, Christopher, Amanda and Rachel,[1] with the children spending the school year with Jolee. Ronald agreed to pay $700 each month to Jolee in child support and $1,100 each month, for the first eighteen months, in alimony. After the first eighteen months, Ronald's alimony payment would increase to $1,200 each month. The alimony was to continue until Jolee remarried or upon further order of the court.
¶ 3. After the divorce, Jolee began a relationship with James Burrus, who is Ronald's brother. James was a convicted sex offender, who was recently released from prison in Texas. Jolee's relationship with James is at the center of this controversy.
¶ 4. On May 11, 2004, Ronald filed a sworn complaint for modification and for other relief. Ronald asked the court to grant him custody of the children, require Jolee to pay child support, terminate the periodic alimony, and enter a monetary judgment against Jolee.
¶ 5. Also, on May 11, 2004, Ronald filed a sworn motion for ex parte temporary relief. In the motion, Ronald claimed that Jolee "allows a convicted sex offender to reside in the home with the minor children present. That such sex offender has just been released from prison, having been found guilty on four (4) counts of indecency with a child/sexual contact in the State of Texas." Ronald alleged that such "living conditions" present an "immediate and irreparable injury, loss or damage" to the children. Ronald asked for immediate custody and a suspension of his child support payments. By order dated May 11, 2004, the Honorable Jim Persons entered an ex parte order that temporarily removed the children from Jolee's custody, placed the children in Ronald's custody, and suspended Ronald's child support obligation until a full hearing could be held.
¶ 6. On May 13, 2004, Ronald filed a motion for temporary relief. In this motion, Ronald asked the court to grant him temporary custody of the children, require Jolee to pay child support, and to require Jolee to provide him with the children's personal belongings.
¶ 7. On May 28, 2004, Jolee filed a petition for citation of contempt, a motion to set aside ex parte order, her affirmative defenses and answer to the motion for temporary relief, and a counter-complaint for modification and for other relief.
¶ 8. In the petition for citation for contempt, Jolee alleged that Ronald violated several terms of their judgment of divorce and should be held in contempt as a result. For example, Jolee alleged that Ronald exposed the children to immoral activities by having a woman spend the night in his home when the children were present, failed to foster and encourage a positive relationship between the children and the other parent, failed to execute a quitclaim deed; failed to maintain adequate medical and dental insurance, failed to reimburse her for all medical expenses, failed to pay all alimony amounts, and failed to maintain life insurance because his brother James was named as the beneficiary.
¶ 9. In the motion to set aside the ex parte order, Jolee alleged that the allegations of Ronald's motion were without merit and were "made in retribution for [Jolee] being involved in a relationship with [Ronald]'s brother."
¶ 10. In the answer and counterclaim, Jolee denied Ronald's allegations and asked the court to increase the child support and alimony payments, order reimbursement *621 of medical expenses, allow her to claim two of the children as dependents on tax returns, and require Ronald to pay her one-half of his 2003 tax refund.
¶ 11. On June 9, 2004, a hearing was held before Chancellor Sandy Steckler. The chancellor entered a temporary order that set aside the ex parte order and returned temporary custody of the children to Jolee subject to further order of the court. Ronald's child support payments were reinstated. The order also placed other restrictions on Jolee and Ronald. They were ordered not to discuss the litigation with the children, Jolee was "enjoined from permitting any contact between Jim Burrus and the parties' minor children," and both were enjoined from having overnight guests of the opposite sex. The chancellor's order included language that would allow the ban on contact with James Burrus to be reconsidered after James presented the court a psychological evaluation declaring he was no longer a threat to the children's safety.
¶ 12. The chancellor heard testimony on September 13, 2004, and October 13 and 15, 2004. On September 14, 2004, the chancellor entered a temporary order that transferred custody of one child, Rachel Marie Burrus, to Ronald. The order stated that Jolee announced that she had no objection to the transfer of temporary custody of Rachel to Ronald.
¶ 13. At the conclusion of the hearing on October 15, 2004, the chancellor took this matter under advisement. During the hearing, Jolee testified that she would consent to allow Rachel to reside with Ronald. On November 23, 2004, Jolee filed a notice of withdrawal of consent. The notice attached a document entitled "Election Pursuant to Miss.Code Ann. § 93-11-65." Rachel signed this "Election" and indicated that she would elect to live with Jolee. The document was notarized and witnessed by Amanda.
¶ 14. On January 14, 2005, the chancellor issued his judgment of modification. In the judgment, the chancellor modified custody of the children, terminated Ronald's child support obligation, terminated Jolee's alimony payments, imposed a child support obligation on Jolee, and found Jolee in contempt of court. It is from this order that Jolee appeals.

STANDARD OF REVIEW
¶ 15. This Court will not "disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Crow v. Crow, 622 So.2d 1226, 1228 (Miss.1993); Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990).

ANALYSIS
I. Did the chancellor err as a matter of law in ruling that Jolee's brief affair with a third party amounted to "cohabitation" justifying the termination of alimony, or alternatively, did the chancellor lack substantial evidence that Jolee was supporting the third party justifying terminating alimony payments?
¶ 16. Jolee's first issue argues that the chancellor erred when he terminated her periodic alimony. Jolee claims that her sexual relationship with James Burrus did not amount to "cohabitation."
¶ 17. Periodic alimony may be terminated based on cohabitation or a de facto marriage. In her recent book, Professor Deborah H. Bell, Mississippi Family Law § 9.10[2](2005), summarized this principle as follows:
[a] Cohabitation and presumed support. In 1997, the supreme court discarded the fact-based test for determining *622 whether an alimony payee's cohabitation involves mutual financial support. The court reasoned that an alimony payor lacks the necessary information to prove mutual support between cohabitants. Accordingly, the court adopted a presumption that cohabitation is accompanied by financial support. [Scharwath v. Scharwath, 702 So.2d 1210, 1211 (Miss.1997); see Alexis v. Tarver, 879 So.2d 1078, 1082 (Miss.Ct.App.2004)]
A short period of cohabitation may not trigger the presumption. A chancellor properly refused to reduce alimony to a recipient whose friend and two sons moved into her house for five weeks after a hurricane. Her friend did not share her bedroom, bought groceries only once, and moved when his home was repaired. [Tillman v. Tillman, 809 So.2d 767, 770 (Miss.Ct.App.2002)] In a factually unusual case, a chancellor properly conditioned an award of rehabilitative alimony on the wife's moving from her boyfriend's home and establishing her own residence. [Alexis v. Tarver, 879 So.2d at 1082]
[b] De facto marriage. Alimony may also be terminated even in the absence of cohabitation if a court finds that a payee is avoiding marriage to continue alimony. Alimony was terminated to a payee who was engaged without immediate plans to marry, even though there was little evidence of mutual financial support, on the basis that she had entered a de facto marriage. The court found significant that the couple appeared to forego marriage to obtain the benefits of alimony, stating that "equity should not require the paying spouse to endure supporting such misconduct." [Martin v. Martin, 751 So.2d 1132, 1136 (Miss.Ct.App.1999)]
The de facto marriage test was restated recently to include an element of financial support. The court of appeals stated that alimony may be terminated where a recipient and another person "so fashioned their relationship, to include their physical living arrangements and their financial affairs, that they could reasonably be considered as having entered into a de facto marriage." Applying this test, no de facto marriage existed based on proof that a woman spent several weekends with a man, that he stayed at her house overnight five or six times, and that he purchased groceries on those occasions. [Pope v. Pope, 803 So.2d 499, 504 (Miss.Ct.App.2002)]
¶ 18. The chancellor found that Jolee's cohabitation with James was a material change of circumstances that allowed modification of the alimony award. The chancellor made the following findings of fact and conclusions of law:
Testimony and evidence show that until his most recent incarceration, Jolee and James cohabited without the benefit of marriage and mutually supported each other. James had a key to Jolee's home and kept his clothes there. James had an automatic teller machine card to Jolee's account and her authority to use it. During the year 2004, Jolee spent in excess of $7,500.00 on James paying for his psychological evaluation, his car tag, his attorney fees, his clothes, his cell phone, cell phone bills, materials for his job as a self-employed carpenter and painter, and his motel room charges when he was attempting to evade being arrested. According to her testimony, she receives approximately $1,800.00 per month from Ronald,. . . . During September of 2004 Jolee spent $7,521.39 running her household, which included her support of James. Some of James' most recent criminal charges are in Texas. At the time of the modification trial Jolee had paid approximately $4,500.00 *623 in attorney fees for James. In return, James Burrus continually performed and provided "in kind" household services and chores in Jolee's home, including maintenance and repair of the home. Jolee testified that approximately mid-September of 2004 she injured her foot and allegedly broke up with James because he had started drinking again. However, James continued to stay at the house and help Jolee because of her injury. According to the testimony, the only reason Jolee and James Burrus did not marry was so they would continue to be supported by the monies received from Ronald.
At the time of trial James Burrus was in jail on contempt charges. Although Jolee testified that their relationship was over, she continues to visit him during this most recent incarceration. Additionally, Jolee testified, as did her children, that she had recently gotten a tattoo that says, "James' girl" which she showed to her middle child Amanda.
"[P]roof of cohabitation creates a presumption that a material change in circumstances has occurred. [citation omitted] This presumption will shift the burden to the recipient spouse to come forward with evidence suggesting that there is no mutual support within his or her de facto marriage." Scharwath v. Scharwath, 702 So.2d 1210, 1211 (Miss. 1997). Jolee readily admitted she and James cohabited without the benefit of marriage. Accordingly, it was her burden to prove a lack of mutual support in order to overcome the presumption of a material change in circumstances warranting a modification or cessation of periodic alimony. Based upon the testimony and facts recited herein, the court finds that Jolee did not meet her burden.
¶ 19. Jolee's argument before this Court is two fold. First, Jolee cites us to Hammonds v. Hammonds, 641 So.2d 1211, 1217 (Miss.1994), where the supreme court held that when "determining the effect of post-divorce cohabitation on a recipient spouse's alimony entitlement, financial, rather than moral aspects of the cohabitation are to be considered." Jolee argues that the moral aspect of couples living together must not be considered. While, this is a correct statement of the law, it appears from the findings that the chancellor actually took into account the financial aspects of Jolee and James's relationship. As mentioned above, the judge considered that Jolee had spent more than $7,500 on James in less than one year. Also, the judge found that James would complete chores and work around the house providing support "in kind." The judge considered the financial aspects of the cohabitation and did not base the decision on the moral aspects as Jolee argues.
¶ 20. Second, Jolee argues that the chancellor simply was wrong in determining that Jolee and James were cohabiting. Jolee alleges that the relationship lacks the permanency required to be cohabitation supported by her testimony that the relationship lasted from May to mid-September, only four and one-half months long. The chancellor appears to have doubted Jolee's claim that the relationship was over. This is apparent from the statement that "[a]lthough Jolee testified that their relationship was over, she continues to visit him during this most recent incarceration." In addition, Jolee and the children testified that James never stayed more than a week or two at a time and most of the time he left late at night and did not sleep over. Testimony from both parties stated that James had his own residence in Bay St. Louis, while Jolee lived in Long Beach.
*624 ¶ 21. Jolee also cites Ellis v. Ellis, 651 So.2d 1068 (Miss.1995). In Ellis, Glenda Ellis spent the night at Smith's apartment several times a week and on other nights Smith would leave Glenda's home at about 11:00 p.m. Id. at 1070. Smith had not paid any of Glenda's utilities or house payments and did not keep clothes or receive mail at her house. Id. The court stated that from the facts "it [was] unclear whether Glenda Moore Ellis cohabited with another man although she had substantial contact with him for a long period of time and he was a frequent overnight guest." Id. at 1071. The supreme court remanded the case for a determination if Glenda cohabited with Smith and whether she received support from him or he received support from her. Id. While the supreme court was unsure of cohabitation, the chancellor did not make a specific finding of cohabitation, it left the determination of cohabitation to the discretion of the chancellor.
¶ 22. The facts here are similar. Jolee and James were in a relationship for a similar period of time, had similar visitation arrangements, yet from the facts before us, the support that Jolee and James provided each other was much more substantial than what was established in Ellis. Here, the chancellor, in his discretion, found that the evidence showed Jolee cohabited with James, and Jolee provided sufficient financial support to justify a material change in circumstances that would support the termination of alimony.
¶ 23. Jolee also cites us to Pope v. Pope, 803 So.2d 499 (Miss.Ct.App.2002). Mrs. Pope became involved with a man after the divorce and spent a number of weekends in his company. Id. at 504(¶ 11). He helped pay for the weekend encounters and stayed overnight five or six times in her home. Id. On the occasions that he stayed overnight, he had helped buy groceries. Id. There was also evidence that Mrs. Pope had loaned him $4,000, and she testified that it had been paid back. Id. The chancellor found that this proof was insufficient to find cohabitation. Id. at (¶ 13). This Court affirmed the determination of the chancellor stating that:
if the alimony recipient and another individual have so fashioned their relationship, to include their physical living arrangements and their financial affairs, that they could reasonably be considered as having entered into a de facto marriage, then the obligor may be relieved of his obligation to pay alimony the same as if his former spouse had entered into a de jure marriage.
Id. at (¶ 12) (citing Scharwath, 702 So.2d at 1211 (¶ 6-7)).
¶ 24. Similar to Pope, Jolee loaned money to James. Jolee admitted that she did not know how much money had been loaned. Jolee testified that the entire amount had not been repaid, but that James was to repay with cash or by performing work on Jolee's house. Unlike Pope, it appears that James had spent more than five or six occasions with Jolee. The most important distinction between the two cases is the finding of the chancellor. In Pope, the chancellor found the proof to be insufficient to amount to cohabitation, while the chancellor here found that the evidence amounted to cohabitation. Thus, we turn to the chancellor's finding and analyze it based on the appropriate standard of review to determine if he was in error.
¶ 25. For this Court to overturn the chancellor's finding of cohabitation, the chancellor must be manifestly wrong, clearly erroneous, or he applied the wrong legal standard. Crow, 622 So.2d at 1228. Here, the chancellor applied the proper standard when he found cohabitation based on the financial aspects of the relationship and not the moral aspects of the *625 relationship. Hammonds, 641 So.2d at 1217. Upon proof of cohabitation, the chancellor accurately applied the presumption that Jolee was required to present proof suggesting that there was no mutual support within the relationship. Scharwath, 702 So.2d at 1211(¶ 7). The chancellor then found that Jolee had not overcome this burden and failed to prove lack of mutual support. Since the chancellor applied the proper legal standard, we look to the evidence to determine if he was manifestly or clearly erroneous.
¶ 26. After thoroughly examining the record, we find that there is evidence to support the chancellor's conclusion that James and Jolee have arranged their physical living arrangements and financial affairs as a couple evidencing a de facto marriage, as required in Pope.
¶ 27. Accordingly, we find no merit to this issue and affirm the chancellor's judgment.
II. Did the chancellor err as a matter of law in concluding that Jolee's "cohabitation" with a third person occurred, creating a material change of circumstances, or alternatively, did the chancellor abuse his discretion in modifying custody of the two minor children from Jolee's primary physical custody?
¶ 28. Jolee argues that the chancellor erred when he modified custody and gave Ronald physical custody of the children. Jolee claims that the chancellor erred in finding that there was a material change of circumstances that adversely affected the children and in considering the Albright v. Albright, 437 So.2d 1003 (Miss. 1983) factors.
¶ 29. In Mabus v. Mabus, 847 So.2d 815, 818(¶ 8) (Miss.2003), the supreme court held:
In a case disputing child custody, the chancellor's findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied. Hensarling v. Hensarling, 824 So.2d 583, 587 (Miss.2002). See also Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997); Williams v. Williams, 656 So.2d 325, 330 (Miss.1995). The burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home. Riley v. Doerner, 677 So.2d 740, 743 (Miss.1996).
In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody. Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992).
. . . .
In considering whether there has been such a change in circumstances, the totality of the circumstances should be considered. (Spain v. Holland, 483 So.2d 318, 320 (Miss.1986)). Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children. Id. Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997). Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 30. Here, the chancellor applied the three-step analysis. The chancellor began his analysis with the first two factors. The chancellor determined that there was a substantial or material change in circumstances *626 that adversely affected the children's welfare. The chancellor found:
Jolee admitted that since the entry of the Judgment of Divorce she cohabited with the brother of her ex-husband, James Burrus, that James is a convicted felon, and although she does not believe he is actually guilty, his felony convictions were for four (4) counts of indecency with a 14 year old minor to which he plead guilty. Jolee admitted that she, James Burrus and her children resided in the same household. Jolee admitted that since the divorce she had been unable to consistently have the youngest child, Rachel, at school at the appropriate time. The evidence presented also showed that Jolee would sleep for days at a time, awaking only to eat and returning to bed, and that the middle child, Amanda, received virtually no discipline from her mother. The Court finds that Jolee's behavior since the divorce is adversely affecting her children.
¶ 31. Having met the first two factors, the chancellor conducted an Albright analysis. The chancellor found the following factors to be neutral: age, health, sex of the child; continuity of care; physical and mental health and age of the parents; emotional ties of the parent and the child; and the home, school and community record of the child. The chancellor found the following factors to favor Ronald: parenting skills, willingness, and capacity to provide primary child care; employment of the parent and responsibilities of that employment; moral fitness; and stability of home. The chancellor found no factors in favor of Jolee, but discussed the preference of the child. At the time of the hearing, Rachel was eleven and not of legal age to state a preference. Nevertheless, she expressed her desire to live with Ronald and Jolee agreed. As a result a temporary order was entered. After the trial, Jolee filed pleadings that indicate that Rachel stated her preference to live with Jolee. Amanda expressed her desire to remain in the custody of Jolee. However, the chancellor determined that it would not be in Amanda's best interest to honor her stated preference.
¶ 32. The chancellor held:
"The Supreme Court has said that `only parental behavior that poses a clear danger to the child's mental or emotional health can justify a custody change.'" Thompson v. Thompson, 799 So.2d 919, 923 (Miss.Ct.App.2001) (quoting Morrow v. Morrow, 591 So.2d [829,] 833 (Miss. 1991)). In this case, based on the foregoing facts and findings, and after having fully considered the Albright factors, the Court finds that the actions of Jolee subsequent to the entry of the divorce judgment have jeopardized the mental and emotional health of her minor children such that modifications of the custody provisions of the Judgement of Divorce are warranted.
¶ 33. We find that there was sufficient evidence to support the chancellor's decision to modify custody. Accordingly, we affirm the chancellor on this issue.
¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] Christopher was emancipated prior to the entry of the chancellor's judgment.