ROBERTS, J.,
 

 for the Court.
 

 SUMMARY OF THE CASE
 

 ¶ 1. John and Beth Rester divorced and executed a property settlement agreement. Within that agreement, John agreed to pay Beth $2,500 in monthly periodic alimony. Approximately ten years later, John claimed Beth had been cohabitating with a man named A1 Cabrera as though they were married. Consequently, John sought to terminate his obligation to pay Beth alimony. In response, Beth filed a request for additional alimony. After conducting a hearing, the chancellor denied John’s request for termination of alimony. Though the chancellor found that Cabrera and Beth had substantial contact for approximately five years, the chancellor also found that the facts were “just shy” of meriting termination of alimony. However, the chancellor also denied Beth’s request for additional alimony. Aggrieved, John now appeals, and Beth cross-appeals. After careful consideration, we conclude that the chancellor committed reversible error when he declined to terminate John’s obligation to pay Beth alimony. Accordingly, we affirm the chancellor’s judgment to decline to increase John’s alimony payments to Beth.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. John and Beth were married for approximately ten years before the Harrison County Chancery Court granted their divorce based on irreconcilable differences. When they divorced, they also executed a property settlement agreement. Most pertinent to our present purposes is the provision by which John agreed to pay Beth monthly periodic alimony payments of $2,500 until Beth died, remarried, or the chancery court otherwise terminated his obligation.
 

 ¶ 3. Approximately ten years later, John filed a complaint in the Harrison County Chancery Court to terminate his alimony obligation. John claimed there was a material change in circumstances in that Beth had been living with Cabrera. Beth responded and denied that she cohabitated with Cabrera. Additionally, Beth filed a counterclaim and requested an increase in alimony. John denied that Beth was due an increase in alimony.
 

 ¶ 4. After a hearing on both motions, the chancellor found that it was a close question, but termination of alimony was just shy of being merited. According to the chancellor, though Beth had substantial contact with Cabrera, it was unclear whether they lived together. The chancellor also found that Beth and Cabrera did not provide regular mutual financial support to one another. Consequently, the chancellor denied John’s request to terminate alimony. Likewise, the chancellor denied Beth’s request for additional alimony. John appeals, and Beth cross-appeals.
 

 STANDARD OF REVIEW
 

 ¶ 5. “This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.”
 
 Burrus v. Burrus,
 
 962 So.2d 618, 621(¶ 15) (Miss.Ct.App.2006) (citations and internal quotations omitted).
 

 ANALYSIS
 

 ¶ 6. John claims the chancellor erred when he declined to terminate alimony. Periodic alimony may be terminated based on either cohabitation or a de facto marriage.
 
 Id.
 
 at (¶ 17). Having reviewed the record, we must conclude that the chancellor was clearly and manifestly
 
 *1134
 
 wrong when he concluded that Beth and Cabrera did not live together.
 

 ¶ 7. First, it is necessary to get a perspective of Beth’s and Cabrera’s respective personal living situations. Beth lived in the marital home she received as a result of her and John’s divorce. At the time of the hearing, Beth had not worked for approximately twenty-one years. She testified that she initially stopped working to. take care of her and John’s daughter, but their daughter was in graduate school in North Carolina at the time of the hearing. Beth clarified that it was her choice not to work.
 

 ¶ 8. Cabrera worked as a construction superintendent. The responsibilities of his employment dictated that he live in temporary living quarters, such as apartments and hotel rooms. Though he often remained at one job site or another for a period of months, he did not have what he considered a permanent residence after late 2004. The record shows that during the course of his relationship with Beth, Cabrera lived in Colorado; Pensacola, Florida; Point Clear, Alabama; Fairhope, Alabama; and Dauphin Island, Alabama.
 

 ¶ 9. At the time John filed his complaint to terminate alimony, Beth and Cabrera had been involved in a sexual relationship for approximately five years. Though Beth speculated that she “might have” dated “someone else a couple times” between December 2002 and December 2004, from that time forward, she and Cabrera were monogamous and exclusive. In February 2006, Beth submitted a sworn affidavit to her property insurer and characterized Cabrera as her “fiancee.” Beth explained that she used the term “fiancee” because, at her age, she did not want to use the term “boyfriend” or “significant other.” At other times, Beth characterized her relationship with Cabrera as having “a man in her life” and “a very mature, grownup relationship.” Beth once pointed out that John and his current wife lived together before they were married. Beth then stated, “[y]ou know, people do that nowadays. I don’t know why ... I’m getting tarred and battered because I have a boyfriend.”
 

 ¶ 10. With that background in mind, we can more clearly evaluate Beth and Cabrera’s relationship in chronological order. Though Cabrera and Beth were apparently involved some time before 2003, the record only contains specific details of their relationship from 2003.
 

 ¶ 11. In March 2003, Beth and her daughter traveled to Colorado and visited Cabrera for spring break. In October 2003, Beth traveled to Colorado and stayed with Cabrera for three weeks after she had eye surgery. In December 2003 or January 2004, Cabrera went with Beth to her daughter’s college graduation in North Carolina. In February 2004, Beth traveled to Colorado and spent another three weeks with Cabrera. Beth testified that she would have stayed with Cabrera longer, but she had to leave to tend to her mother.
 

 ¶ 12. The record does not detail any specific events between February 2004 and November 2004. We have no way of knowing how much or how little time Beth and Cabrera spent together. However, Cabrera stopped working in Colorado some time between September or November 2004. The events that followed are undisputed. The characterization of those events, however, is somewhat disputed.
 

 ¶ 13. It is undisputed that Cabrera left Colorado, that he put his furniture in storage, and that he had no particular permanent residence of his own. According to Beth, Cabrera “brought some [of his] things over to [her] house.” Beth unequivocally admitted that Cabrera lived with
 
 *1135
 
 her. According to Beth, between December 2004 and August 29, 2005, Cabrera was at her house when he was not working. John’s attorney asked Beth, “[b]ut the reality of it was that the only time [Cabrera] didn’t live [at your house] during these periods of time would be when his work took him to another place; isn’t that right?” Beth answered, “[t]ook him to another place,
 
 absolutely.”
 

 ¶ 14. Cabrera characterized things differently. According to Cabrera, he did not move into Beth’s home. Cabrera testified that when he left Colorado in September or November 2004, he moved into a Pensacola hotel room that his employer provided. Cabrera remained in that hotel room for seven or eight months. Cabrera testified as to the amount of time he spent at Beth’s house for the next several months.
 

 ¶ 15. Cabrera testified that he might have spent four days at Beth’s house during November 2004. In December 2004, he spent between four days and a week at Beth’s house. He testified that between January and April 2005, he did not stay at Beth’s house at all. Cabrera further testified that, in May 2005, he “maybe” spent a couple days at Beth’s house. A portion of Cabrera’s testimony was particularly illuminating in that Cabrera testified that he
 
 “came home
 
 ” when he left Pensacola in May 2005.
 
 [1]
 
 Cabrera estimated that he spent two days at Beth’s house in June 2005. He stated that he spent another two or three days at Beth’s house during July 2005. He spent a similar amount of August 2005 at Beth’s house.
 

 ¶ 16. Unfortunately, Hurricane Katrina destroyed Beth’s home when it made landfall on August 29, 2005.
 
 [2]
 
 Cabrera and his son were at Beth’s house at that time. For the first week or two after Hurricane Katrina destroyed Beth’s home, Cabrera, Beth, Cabrera’s son, and Beth’s daughter all stayed in a hotel in Opelika, Alabama. When they left the hotel, Cabrera and Beth both stayed with Beth’s sister in Opelika. From there, they both moved in with Beth’s sister in Biloxi. Cabrera eventually purchased a home from Beth’s sister. Cabrera corroborated Beth’s testimony regarding the events after Hurricane Katrina made landfall.
 

 ¶ 17. Despite Cabrera’s testimony that he did not live with Beth, we must conclude that the chancellor was clearly wrong when he declined to find cohabitation. Beth admitted that Cabrera lived with her. John’s attorney referenced Beth’s interrogatory responses and asked Beth, “you indicated that [Cabrera] actually moved into your residence there in December of 2004; is that correct?” Beth answered, “[r]ight.”
 

 ¶ 18. Though Cabrera testified he lived in Pensacola, his other testimony contradicts that. Cabrera had no other home in Harrison County, but he testified that he “came home” in May. On separate occasions, Cabrera listed Beth’s address as his residence when he registered his vehicles. Cabrera also twice listed Beth’s address as his residence on ad valorem tax receipts for property he owned in Harrison County. Cabrera testified that aside from Beth’s house, he could stay at his son’s house in Harrison County. However, he also testified that he could not remember how many times he stayed at his son’s house. He speculated that he might have spent one
 
 *1136
 
 day there in July of some unspecified year. After Hurricane Katrina made landfall, Beth and Cabrera stayed together in a hotel for approximately two weeks. From there they both stayed with Beth’s sister in Opelika, and they then stayed with Beth’s sister in Biloxi.
 

 ¶ 19. In
 
 Scharwath v. Scharwath,
 
 702 So.2d 1210, 1211(¶7) (Miss.1997), the Mississippi Supreme Court adopted the rule that' “proof of cohabitation creates a presumption that a material change in circumstances has occurred.” The rationale behind the supreme court’s implementation of this presumption is the “difficulty a providing spouse faces in presenting direct evidence of mutual financial support between cohabiting parties.”
 
 Id.
 
 The supreme court went on to state that “parties who live in cohabitation can easily and purposely keep their condition of mutual financial support concealed from the paying spouse, as well as from courts seeking only financial documentation before it will grant a modification.”
 
 Id.
 
 Accordingly, upon proof of cohabitation, the burden of proof shifts “to the recipient spouse to come forward with evidence suggesting that there is no mutual support.”
 
 Id.
 

 ¶ 20. Beth did not rebut the presumption of mutual support. Instead, the evidence indicates that there was mutual support to the degree that Beth and Cabrera needed it. That is, Beth was financially independent for the most part, and Cabrera was also financially independent, so they did not need what could be considered traditional financial support. Nonetheless, there was mutual support between Cabrera and Beth.
 

 ¶ 21. Beth testified that Cabrera contributed to her and her household. When Cabrera moved in, he bought a flat-screen television because, as Beth put it, she had “an old thick one.” According to Beth, though Cabrera did not necessarily buy all of the groceries, when she went grocery shopping, Cabrera gave her money in the form of cash or the free use of his debit card. Beth went on to testify that she would spend approximately $300 when she used Cabrera’s debit card. It follows that Beth knew the PIN number that corresponded to Cabrera’s debit card.
 

 ¶ 22. When Cabrera left town for work, he would leave her $1,000 or $1,500. Beth clarified that some of that money was to pay for Cabrera’s insurance, doctor bills, or anything else that Cabrera received in his post office box.
 
 [3]
 
 Beth also testified that after she paid Cabrera’s bills, whatever was left would vary. She did not testify that she returned the balance to Cabrera. Pursuant to Beth’s interrogatory responses, it appears that at least some of that money went to her utility payments. Though Beth testified that Cabrera never gave her money specifically for her utilities, Beth indicated that Cabrera “helped” her with her utilities.
 

 ¶23. Beth also testified that Cabrera gave her money when she went on trips. According to Beth, Cabrera gave her “$300 or $400 or whatever.” Further, Cabrera gave Beth money for clothes. Beth testified, “I was living on $2,500 a month, you know. Let’s get real. There were times that I could use some extra money, and, yes, he was — [Cabrera] would hand me a couple of hundred extra dollars if I needed it.”
 
 [4]
 

 ¶ 24. Beth testified that Cabrera helped her with repairs around her home. She
 
 *1137
 
 testified that they planted flowers and shrubs together. She also testified that they worked together to build a sidewalk. According to Beth, she and Cabrera worked together to either repair or build a fence on the side of her house. Beth explained that she and Cabrera went to Home Depot and bought the materials together. Additionally, Beth testified that she and Cabrera bought lumber and built shelves in her storage room. Cabrera did not necessarily pay for all of the materials, but there were occasions when he paid. Finally, Beth testified that she and Cabrera bought a skiff at a yard sale. She went on to testify that they repaired it together. When Cabrera went out of town for work, he left his personal vehicle at Beth’s house, so Beth could use it if she wanted to purchase gardening materials.
 

 ¶ 25. In summary, there is no doubt that Beth failed to rebut the presumption of mutual support. In fact, the evidence overwhelmingly demonstrated the presence of mutual support. Cabrera bought groceries for Beth. By Beth’s testimony, Cabrera gave her money for clothes and when she went on trips. Beth had access to Cabrera’s debit card PIN number. Cabrera left money with Beth when he went out of town. During those times, Beth checked Cabrera’s mail, opened it, and paid his bills. Beth testified that Cabrera never gave her money specifically for utilities, but she nonetheless testified that he “helped” her with her utilities. Cabrera helped Beth with projects around her home. Cabrera had a place to leave his personal vehicle when he went out of town for work, and Beth had the benefit of access to Cabrera’s personal vehicle whenever she wanted to use it. Despite characterizing Harrison County as a whole as his home, it was at Beth’s house that Cabrera stayed when he returned “home.” Through Beth’s family, Cabrera had a place to live after Hurricane Katrina devastated the Mississippi Gulf Coast.
 

 ¶26. Because Beth admitted that she and Cabrera cohabited, and failed to rebut the presumption of mutual support, we must conclude that the chancellor was clearly wrong when he declined to terminate alimony. Accordingly, we are compelled to reverse the judgment of the chancellor and render judgment for John. Thus, John’s obligation to pay Beth monthly periodic alimony is hereby terminated.
 

 ISSUE ON CROSS-APPEAL
 

 ¶27. Beth claims the chancellor erred when he denied her counterclaim for increased monthly periodic alimony. Having found that the chancellor erred when he declined to terminate Beth’s alimony, it is unnecessary to consider whether the chancellor should have increased John’s alimony obligation. Accordingly, we affirm the chancellor’s judgment on this issue.
 

 ¶ 28. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS REVERSED AND RENDERED FOR THE APPELLANT/CROSS-APPELLEE ON DIRECT APPEAL. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE/CROSS-APPEL-LANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND CARLTON, JJ., CONCUR. ISHEE, J., NOT PARTICIPATING.
 

 [1]
 

 . Beth's attorney wanted to clarify Cabrera's testimony as to what "came home” meant. Cabrera testified, "[h]ome in the sense this is my home here. Biloxi is my home. That's what I mean when I'm home. Back to — my office is here. We work out of Biloxi.”
 

 [2]
 

 . In reaching his decision, the chancellor did not consider any of the events that occurred after Hurricane Katrina made landfall.
 

 [3]
 

 . Logic dictates that Beth had access to Cabrera's post office box and that she had his authorization to open his mail.
 

 [4]
 

 . Beth also testified that she had "always lived on [her] little $2,500 a month” whereas "John always lived a good life and a big life
 
 *1137
 
 and an expensive life, and [she] never asked for any extra.”