## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01490-COA

IN THE MATTER OF DISSOLUTION OF THE
MARRIAGE OF KAREN CONWAY LEWIS AND
ADAM ISAAC LEWIS: ADAM ISAAC LEWIS                    APPELLANT

v.

KAREN CONWAY LEWIS                                    APPELLEE

DATE OF JUDGMENT:             07/11/2016
TRIAL JUDGE:                  HON. CYNTHIA L. BREWER
COURT FROM WHICH APPEALED:    MADISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:      MICHAEL J. MALOUF
                              ROBERT EUGENE JONES II
ATTORNEYS FOR APPELLEE:       JOHN ROBERT WHITE JR.
                              PAMELA GUREN BACH
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              RENDERED IN PART - 03/20/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.    Adam Isaac Lewis alleges that his obligation to pay alimony to his ex-wife Karen Conway Lewis should be terminated because Karen is cohabiting or in a de facto marriage with her longtime boyfriend. Adam's complaint to terminate alimony proceeded to trial, and after Adam rested his case, the chancellor found that he had not met his burden of proof and dismissed his complaint pursuant to Mississippi Rule of Civil Procedure 41(b). The chancellor also awarded Karen half of the attorney's fees that she incurred defending the case. Adam challenges both the dismissal of his complaint and the award of attorney's fees

to Karen. We affirm the dismissal of Adam's complaint because the chancellor did not clearly or manifestly err by finding that Adam failed to meet his burden of proof. However, we reverse and render the award of attorney's fees because it is clear that Karen is financially able to pay her own attorney.

## FACTS AND PROCEDURAL HISTORY

¶2.     Adam and Karen were married in 1989 and were granted an irreconcilable differences divorce in 2002. The final judgment of divorce incorporated the parties' child custody and property settlement agreement, which granted Karen physical custody of the couple's four minor children.[1] The agreement provided that Adam would pay Karen $15,000 per month as "permanent periodic alimony." The agreement stipulated that alimony was "modifiable" and would terminate upon Karen's remarriage or death or upon Adam's death. The agreement further stated that alimony was based on Adam's "projected business net income of $700,000 per year." In 2012, an agreed judgment was entered modifying Adam's child support obligations and requiring Adam to disclose his tax returns to Karen each year.

¶3.     In 2015, Adam filed a complaint alleging that his obligation to pay alimony should be terminated because "[Karen] has substantial savings and/or other investments, is well educated and fully capable of supporting herself, but refuses to do so." The complaint further alleged that Adam's alimony permitted Karen to "enjoy[] a life of leisure without gainful employment, while being romantically involved and living with another man all at [Adam's] expense." Karen answered, denied Adam's allegations, requested attorney's fees,

_____

[1] The children all have reached the age of majority, and Adam's obligation to pay child support to Karen has terminated.

2

and filed a counterclaim alleging that Adam was in contempt because he had failed to disclose his tax returns as required by the 2012 agreed judgment. Karen later withdrew her counterclaim for contempt after Adam disclosed his tax returns.

¶4.     Adam's complaint for modification was tried on June 30, 2016. Adam testified that he originally agreed to pay Karen alimony of $15,000 per month because he wanted her to be able to stay in the marital home, which carried a substantial mortgage payment. However, Karen subsequently moved out of the marital home and into a smaller house.

¶5.     Adam testified that shortly after their divorce in 2002, Karen began dating Steven Dobel. According to Adam, Karen and Dobel had vacationed together on many occasions and even bought a vacation home together in Maine in 2010 or 2011; however, Karen sold her interest in the home after Adam confronted her about it. Adam also testified that Dobel gave Karen a diamond ring that she once wore on her ring finger; however, it had been "several years" since Adam had seen Karen wear the ring. Adam acknowledged that Karen and Dobel own and live in their own homes and do not spend nights at each other's houses; however, he alleged that they spend their days together and even "take . . . nap[s] in the same bed." Adam acknowledged that his testimony was based primarily on what others had told him. Adam also admitted that he had no evidence that Dobel financially supported Karen or vice versa. Nonetheless, Adam claimed that Karen and Dobel were in a "de facto marriage" because they had held "themselves out as a couple for the last fifteen years," went on "trips with each other," and did not "date other people."

¶6.     Adam testified that since his divorce from Karen, he had married and divorced the

3

same woman three times. He was paying her alimony of $10,000 per month for forty-eight months and child support of $1,000 per month for one child. He also had a child by another woman, whom he paid child support of $1,200 per month.

¶7. Adam is a neurosurgeon. He acknowledged that he has earned at least $700,000 every year since he divorced Karen. He reported income of $2,209,451 in 2012, $2,514,479 in 2013, and $1,848,930 in 2014, and he testified that his income in 2015 was approximately $5,000,000. However, he testified that only about $1,000,000 of his 2015 income was from his medical practice, and the rest was from a sale of a medical device company. Adam testified that he expects his income to decrease in the future.

¶8. Karen has not worked outside the home since her first child was born in 1990. Alimony is her only material source of income. She owns a home valued at approximately $600,000 with no mortgage. She also has a twenty-five percent interest in three family vacation homes. She has checking and savings accounts with a combined balance of $152,277, investment accounts with a combined balance of $24,851, and a retirement account with a balance of $54,819.

¶9. Adam rested his case without presenting any testimony other than his own. Karen then moved to dismiss his complaint pursuant to Mississippi Rule of Civil Procedure 41(b), arguing that Adam had failed to meet his burden of proving a de facto marriage or cohabitation. The chancellor agreed that Adam had failed to meet his burden of proof, commenting that his evidence consisted of "assumptions and/or . . . hearsay." Therefore, the chancellor granted Karen's motion to dismiss.

4

¶10. Karen then proceeded on her request for attorney's fees. She offered her attorney's affidavit and invoices showing that she had incurred total attorney's fees of $27,870.99, she had paid her attorney $15,698.49 of that amount, and her current balance due was $12,172.50. The chancellor found that Karen "is of a financial standing in the court system that is not often seen and is capable of providing some of her own defense costs," so the chancellor denied her request for the full amount of her attorney's fees. However, the chancellor found that Karen was "entitled to receive compensation for the requirement that she come in and defend herself." Therefore, the chancellor awarded Karen half of the attorney's fees that she requested ($13,935.50).

¶11. Adam filed a timely motion for reconsideration on all issues, and Karen filed a timely motion for reconsideration of the denial of half of her attorney's fees. The chancellor denied both motions, and Adam filed a timely notice of appeal.

## ANALYSIS

¶12. On appeal, Adam argues that the chancellor erred by granting Karen's motion to dismiss because he met his burden of proving cohabitation, a de facto marriage, or some other material change in circumstances. Adam also argues that the chancellor erred by awarding attorney's fees. We address these issues in turn below.

### I. Rule 41(b) Dismissal

¶13. In a bench trial, after the plaintiff "has completed the presentation of his evidence, the defendant . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." M.R.C.P. 41(b). A motion for involuntary dismissal

5

under Rule 41(b) is different from a motion for a directed verdict, which is made only in a jury trial. *Ladner v. Stone Cty.*, 938 So. 2d 270, 273 (¶9) (Miss. Ct. App. 2006). "This distinction must be understood, because the standard of review for a dismissal is different than that for a directed verdict." *Id.*

¶14. In ruling on a Rule 41(b) motion to dismiss, "[t]he judge must consider the evidence *fairly*, rather than in the light most favorable to the plaintiff," as would be the case on a motion for a directed verdict or a motion for summary judgment. *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992) (emphasis added). That is, the trial judge should give the plaintiff's evidence only "such weight and credibility as he would ascribe to it if he were making findings of fact and rendering final judgment." *Gray v. Alumax Extrusions Inc.*, 477 So. 2d 1355, 1356-57 (Miss. 1985). If the judge "would find for the defendant" on the evidence presented, "the case should be dismissed." *Corson*, 612 So. 2d at 369. "[T]he motion should be granted if the plaintiff has failed to prove one or more essential elements of his claim or if the quality of the proof offered is insufficient to sustain the plaintiff's burden of proof." *Buelow v. Glidewell*, 757 So. 2d 216, 220 (¶12) (Miss. 2000). "The court must deny a motion to dismiss *only* if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Corson*, 612 So. 2d at 369 (emphasis added).

¶15. "This Court applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to [Rule] 41(b)." *Id.* The trial judge's "decision on the motion is, for purposes of appeal, treated like any other finding of fact. In

6

other words, his decision will not be disturbed on appeal unless it was manifestly wrong." *Gray*, 477 So. 2d at 1357.

¶16. "The chancellor's findings of fact about cohabitation [and] de facto marriage . . . are entitled to substantial deference when reviewed on appeal." *Hughes v. Hughes*, 186 So. 3d 394, 397 (¶6) (Miss. Ct. App. 2016) (quoting *McMinn v. McMinn*, 171 So. 3d 511, 518 (¶27) (Miss. Ct. App. 2014)). "We will not reverse a chancellor's findings regarding the existence or nonexistence of a de facto marriage unless they are manifestly or clearly erroneous." *Id.* at 403 (¶26) (citing *Burrus v. Burrus*, 962 So. 2d 618, 621 (¶15) (Miss. Ct. App. 2006)).

### A.    Cohabitation

¶17. "Modification of alimony may occur upon the existence of a situation of mutual support between the recipient spouse and another individual which alters the recipient spouse's financial needs." *Scharwath v. Scharwath*, 702 So. 2d 1210, 1211 (¶6) (Miss. 1997). "[C]ohabitation creates a presumption that a material change in circumstances has occurred. This presumption will shift the burden to the recipient spouse to come forward with evidence suggesting that there is no mutual support . . . ." *Id.* at (¶7) (citation omitted).

¶18. In the present case, Adam did not prove cohabitation and failed to prove any mutual financial support. Adam admitted that Karen and Dobel maintain separate homes and do not spend the night at each other's homes. Adam also admitted that he had subpoenaed Karen's financial records but had found no evidence that Dobel financially supported Karen or vice versa. On this record, the chancellor did not clearly or manifestly err by finding that Adam failed to meet his burden of proving cohabitation or mutual financial support.

7

## B. De Facto Marriage

¶19. "In the absence of cohabitation, alimony can be terminated based on proof of what has been termed a 'de facto marriage.'" *Hughes*, 186 So. 3d at 400 (¶18). "A de facto marriage may be proven in two ways." *Id.* "First, a chancellor may find a de facto marriage if the alimony recipient is deliberately avoiding remarriage merely to continue receiving alimony." *Id.* (citing *Martin v. Martin*, 751 So. 2d 1132, 1136 (¶16) (Miss. Ct. App. 1999)). "Second, a de facto marriage can be found . . . if the alimony recipient and another person have 'so fashioned their relationship, to include their physical living arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage.'" *Id.* (quoting *Pope v. Pope*, 803 So. 2d 499, 504 (¶12) (Miss. Ct. App. 2002)).

¶20. In *Martin*, Ben and Linda's divorce judgment required Ben to pay Linda periodic alimony. *Martin*, 751 So. 2d at 1133 (¶3). After the divorce, Linda became involved in a long-term relationship with Norm Anderson. *Id.* at (¶5). Linda wore a diamond engagement ring that Anderson gave her, and the couple consistently told friends that they planned to marry "next year." *Id.* Moreover, on cross-examination, Linda "admitted . . . that she and Anderson had not married because she need[ed] the financial support provided by the alimony received from [Ben]." *Id.* Linda and Anderson maintained separate residences, but Anderson's was a "small . . . efficiency apartment," while Linda's was a "luxurious home." *Id.* at 1133, 1136 (¶¶6, 15). Anderson had a key to Linda's home, spent the night at her home a few times each month, ate meals at her home regularly, ran errands for her, and did yard work and other household chores. *Id.* at 1133 (¶6). In addition, Linda had written Anderson

checks totaling over $11,000 over a three-year period. *Id.* Anderson also provided Linda with substantial discounts on clothes and cosmetics from the store where he worked. *Id.* Based on this evidence, the chancellor found that Linda and Anderson had entered into a "de facto marriage" and terminated Ben's alimony obligations. *Id.* at 1134-35 (¶¶10, 14).

¶21. On appeal, this Court affirmed the chancellor's finding that Linda had "structured her relationship with Anderson in an attempt to circumvent the appearance of cohabitation so as to continue her alimony." *Id.* at (¶16). We did so based on Linda's admission under oath "that she and Anderson had not married because she need[ed] the financial support provided by [her] alimony." *Id.* We held that when "an alimony recipient spouse purposefully avoids marriage merely to continue receiving alimony, equity should not require the paying spouse to endure supporting such misconduct." *Id.*

¶22. In contrast, in *Hughes*, *supra*, the chancellor found that the alimony payor failed to prove that his ex-wife, Mariel, had entered into a "de facto marriage" with her boyfriend, Darrell. *Hughes*, 186 So. 3d at 396 (¶3). Mariel and Darrell had been in an exclusive dating relationship for four years, and Mariel wore a diamond ring that Darrell had given her. *Id.* at 398-99 (¶¶11, 13). They maintained separate residences, but they spent the night at each other's homes once a week or more. *Id.* at 398 (¶11). They also traveled and vacationed together, and Darrell had exhibited one of his Corvettes at the National Corvette Museum with a plaque stating that the car was on loan from "Darrell Hill & Mariel Hughes." *Id.* at 399 (¶13). Mariel and Darrell denied that they had discussed marriage or planned to get married. *Id.* at (¶14). However, there was testimony that Mariel once "said that marrying

9

Darrel would 'mess things up' in some unspecified way." *Id.* at 401 (¶22).

¶23.    On those facts, we affirmed the chancellor's finding that the alimony payor failed to prove the existence of a de facto marriage. We concluded that *Martin* was distinguishable because there was no outright admission or other clear evidence that Mariel "was avoiding remarriage solely to continue her alimony payments." *Id.* at 401 (¶22). In addition, the evidence was, at best, conflicting as to whether Mariel and Darrell had "so fashioned their relationship, to include their physical living arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage." *Id.* at 403 (¶26) (quoting *Pope*, 803 So. 2d at 504 (¶12)). They were in a long-term, exclusive relationship, she wore a diamond ring that he gave her, they traveled together frequently, and they spent the night together regularly. However, they maintained separate homes and had no access to one another's financial accounts. *Id.* at 402-03 (¶26). Therefore, there was evidence to support the chancellor's finding that the long-term, exclusive relationship was not a scheme to avoid remarriage to continue alimony payments or a de facto marriage. *Id.* We emphasized, as we had in a prior case, that "[t]he most important distinction" in our precedents on de facto marriage "is the finding of the chancellor." *Id.* at 403 (¶26) (quoting *Burrus*, 962 So. 2d at 621 (¶15)). "We will not reverse a chancellor's findings regarding the existence or nonexistence of a de facto marriage unless they are manifestly or clearly erroneous." *Id.*

¶24.    We reach the same conclusion in the present case. Karen and Dobel obviously are in a long-term, serious relationship. However, unlike *Martin*, there is no outright admission or

10

any other clear or direct evidence that Karen is avoiding remarriage just to continue receiving alimony. Adam testified that *he believes* that is what Karen is doing. However, Adam did not call Karen or Dobel as an adverse witness. In addition, although Adam apparently deposed Karen prior to trial, he did not seek to introduce any part of her deposition into evidence. *See* M.R.C.P. 32(a)(2) ("The deposition of a party . . . may be used [at trial] by an adverse party for any purpose."); *Fred's Stores of Tenn. Inc. v. Pratt*, 67 So. 3d 820, 827-28 (¶¶39-44) (Miss. Ct. App. 2011) (Maxwell, J., concurring in part and in result) (explaining that a plaintiff may introduce a defendant's deposition during the plaintiff's case in chief). Moreover, as in *Hughes*, Karen and Dobel maintain separate residences and separate finances. As noted above, Adam admitted that he had found no evidence that Dobel supports Karen financially or vice versa. Therefore, as in *Hughes*, we cannot say that the chancellor manifestly or clearly erred by finding that Adam failed to prove a de facto marriage.

¶25. To reiterate, a trial judge's ruling on a Rule 41(b) motion to dismiss "is, for purposes of appeal, treated like any other finding of fact. In other words, [her] decision will not be disturbed on appeal unless it was manifestly wrong." *Gray*, 477 So. 2d at 1357. On such a motion, the trial judge is entitled to weigh the credibility of the plaintiff's evidence as if "making findings of fact and rendering final judgment." *Id.* at 1356-57. Thus, to the extent that Adam offered circumstantial evidence that could have *permitted* an inference of a de facto marriage, the chancellor was "not required to look at the evidence in the light most favorable to [Adam]," nor was she required to give him "the benefit of all favorable inferences." *Mitchell v. Rawls*, 493 So. 2d 361, 362 (Miss. 1986) (quoting *Davis v. Clement*,

11

468 So. 2d 58, 61 (Miss. 1985)). The chancellor was entitled to judge the credibility of the evidence and make findings of fact. And we will reverse her decision *only* if she would have been "obliged to find for [Adam] if [Adam's] evidence were all the evidence offered in the case." *Corson*, 612 So. 2d at 369. Adam's evidence was not so compelling as to oblige the chancellor to find in his favor. Therefore, we affirm.

### C.    Material Change in Circumstances

¶26.    Adam also makes a brief argument that other material changes in circumstances warrant a reduction in alimony. Karen argues that Adam failed to preserve this issue because he asked the chancery court to *terminate* alimony based on allegations of cohabitation and de facto marriage and failed to request a *modification* of alimony based on some other change in circumstances. We are inclined to agree with Karen, but we also reject Adam's argument on the merits.

¶27.    "[A]n agreed decree as to alimony is subject to review because of a material change of circumstances"; however, "such a decree . . . will not be modified unless the change in circumstances is clear and substantial." *McKee v. McKee*, 382 So. 2d 287, 288 (Miss. 1980). Moreover, the material change in circumstances must be a change that was "not anticipated at the time of the entry of the original decree." *Anderson v. Anderson*, 692 So. 2d 65, 70 (Miss. 1997). The party requesting a modification of alimony bears the burden of proving a material, substantial, and unanticipated change of circumstances. *See McCraw v. McCraw*, 759 So. 2d 519, 521 (¶7) (Miss. Ct. App. 2000).

¶28.    In this case, Adam failed to meet his burden of proof. The changed circumstances on

12

which he relies were entirely foreseeable. Adam argues that Karen reduced her expenses when she moved out of the marital home; however, the parties' original property settlement agreement expressly anticipated and provided for a subsequent sale of the marital home. Adam also argues that Karen's expenses were reduced when their children grew up and moved out of her home; however, this too was to be expected and hardly can be considered an *unanticipated* change in circumstances. Adam also points out that Karen's finances are sound and that she has some savings and interests in family vacation homes; however, there is no showing of a material and unanticipated improvement in her financial situation since the time of the divorce.

¶29. Finally, Adam emphasizes that since he divorced Karen, he has incurred obligations to pay alimony and child support to a second wife and child support for another child born out of wedlock. "Suffice it to say that generally one cannot relieve himself from the payment of alimony according to the provisions of a divorce decree by the obligations imposed upon him by a second marriage." *De Marco v. De Marco*, 199 Miss. 165, 168, 24 So. 2d 358, 359 (1946). "[W]hen [Adam] remarried and fathered two children, he knew of his obligation to [Karen]." *Rushing v. Rushing*, 909 So. 2d 155, 159 (¶17) (Miss. Ct. App. 2005).

¶30. In summary, Adam's income is more than sufficient to permit him to pay the permanent periodic alimony that he agreed to at the time of his divorce, and he failed to prove any material and unanticipated change of circumstances since the time of his divorce. Accordingly, he is not entitled to a reduction of alimony.

## II. Attorney's Fees

13

¶31. As discussed above, the chancellor found that Karen "is of a financial standing in the court system that is not often seen and is capable of providing some of her own defense costs," so she denied Karen's request for attorney's fees in part. However, the chancellor awarded Karen half of her fees ($13,935.50) because she found that Karen was "entitled to receive compensation for the requirement that she come in and defend herself." Adam argues that this award was an abuse of discretion and should be reversed and rendered, and we are compelled to agree.

¶32. Adam's complaint to terminate alimony was not frivolous or subject to sanctions under the Litigation Accountability Act or Rule 11, nor was he found to be in contempt of court. Therefore, the only possible basis for an award was Karen's own inability to pay the fees. Karen is not entitled to an award of attorney's fees just because Adam "is more capable of paying her attorney's fees." *Rhodes v. Rhodes*, 52 So. 3d 430, 449 (¶79) (Miss. Ct. App. 2011). Rather, Karen must "show that she is unable to pay [her fees]" as "a prerequisite to an award of attorney's fees." *Id.*; *accord, e.g.*, *Watson v. Watson*, 724 So. 2d 350, 357 (¶30) (Miss. 1998) (holding that a chancellor may not award attorney's fees to a spouse who "is financially able to pay for her own attorney's fees").

¶33. Karen failed to show that she is unable to pay her attorney's fees. Karen continues to receive alimony of $15,000 per month from Adam, and she has substantial assets. At the time of trial, Karen already had paid more than half of the fees that she requested, and she only testified vaguely that she thought her mother "might have helped" her make one payment because "that particular month" she could not pay the entire bill. It is clear that

14

Karen is financially able to pay her own attorney's fees. Therefore, we hold that the chancellor abused her discretion by ordering Adam to pay Karen's attorney for her.

## CONCLUSION

¶34. The chancellor did not clearly or manifestly err by finding that Adam did not meet his burden of proof on his complaint to terminate alimony. Therefore, we affirm the chancellor's decision granting Karen's Rule 41(b) motion to dismiss. However, Karen is financially able to pay her own attorney, so Adam should not have been ordered to pay her attorney's fees for her. Therefore, we reverse and render the award of attorney's fees to Karen.

¶35. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**GRIFFIS, P.J., BARNES, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., IRVING, P.J., AND TINDELL, J.**

**CARLTON, J., DISSENTING:**

¶36. The majority finds that the chancellor did not clearly or manifestly err by dismissing Adam's petition to terminate his periodic-alimony obligation to Karen after determining that Adam failed to meet his burden of proof. I disagree, and I respectfully dissent. I find that the record shows that the chancellor erred in dismissing Adam's petition under Rule 41(b) and awarding Karen attorney's fees; accordingly, I would reverse the chancellor's judgment.

¶37. The record reflects that Adam filed a petition in chancery court to terminate his periodic-alimony obligation to his ex-wife Karen. After Adam presented his evidence and testimony at the hearing, Karen moved to dismiss his petition under Rule 41(b) for failure to establish a prima facie case. The chancellor granted the dismissal, and Adam appealed.

15

On appeal, Adam argued the chancellor erred (1) by denying his request to terminate his periodic-alimony obligation, and (2) by ordering him to pay one-half of Karen's attorney's fees.

¶38. Adam and Karen divorced in 2002. At the time of their divorce, the parties had four minor children. Pursuant to their property-settlement agreement, Adam agreed to pay Karen $15,000 a month in periodic alimony. He also agreed to pay monthly child support and to meet certain other financial needs for the children.

¶39. On August 25, 2015, Adam filed a "Petition for Modification," which expressly sought the termination of his periodic-alimony payments to Karen. At the time Adam filed his petition, the parties' four children all had reached the age of majority. In his petition, Adam argued the chancellor should terminate his periodic-alimony obligation because the parties had experienced a material change in circumstances. Adam alleged that the parties' children all had reached the age of majority and that he had continued to pay a substantial amount of alimony to Karen each month although Karen (1) now possessed substantial savings and investments; (2) was well educated and capable of supporting herself; (3) enjoyed a life of leisure without gainful employment; and (4) was in a de facto marriage. Karen filed a response and counterclaim to Adam's petition. In addition to her other requested relief, Karen asked the chancellor to dismiss Adam's petition and to award her reasonable attorney's fees.

¶40. At a hearing on June 30, 2016, Adam testified that at the time of the parties' divorce, they lived in a home with a $10,000 monthly mortgage payment. In the divorce proceedings,

16

Karen received the marital home and the accompanying mortgage payment. Adam testified he wanted his children to remain in their home. As a result, he said he agreed to give Karen $15,000 a month in alimony so she could pay the mortgage and still have funds for the rest of the month. However, Adam stated that Karen decided to downsize to a smaller home six months after the divorce. As a result, Adam paid Karen $170,000 of equity for her share of the marital home.

¶41. According to Adam, at the time of the hearing Karen lived in a paid-for $600,000 home and owned a twenty-five percent interest in homes located in Delaware, South Carolina, and Puerto Rico. Adam also testified that, since their divorce, Karen exclusively had dated Steven Dobel, who owned a house about a mile from her in the same neighborhood. Adam stated that he and Karen had gone on double dates with Dobel and his wife before both couples divorced in 2002. Although Adam testified that Karen and Dobel did not spend their nights together, he stated that he had learned they spent most of their days together and took naps in the same bed before separating at night. Adam further testified that Dobel had given Karen a diamond ring several years before, which Karen had worn on her ring finger, and that Karen and Dobel saw each other on a daily basis and often vacationed together. Adam also stated that Karen and Dobel bought a home together in Maine but that, after Adam confronted Karen about the purchase, Karen sold her interest in the home to Dobel. According to Adam, Karen had obtained a college degree, was in good health, and was capable of gainful employment. However, Adam testified that Karen had not worked since before the parties had their children.

17

¶42. On cross-examination, Adam admitted that he possessed no firsthand knowledge regarding his claims that Karen and Dobel cohabited and were in a de facto marriage. Instead, Adam conceded his testimony was based on his assumptions, Karen's deposition testimony, and what his children, his private investigator, and Dobel's ex-wife had told him. Adam further admitted that, although he had subpoenaed Karen's financial records, he had no actual proof that she and Dobel financially supported one another. Adam also admitted that Karen and Dobel each owned their own homes.

¶43. Adam presented no other witnesses to support his claims. At the close of Adam's case-in-chief, Karen moved to dismiss his petition under Rule 41(b). Karen argued that Adam's testimony alone, which was based solely upon hearsay and assumptions rather than personal knowledge, failed to constitute sufficient evidence to establish a prima facie case of a de facto marriage, cohabitation, or mutual financial support between her and Dobel. In a bench ruling, the chancellor granted Karen's motion to dismiss.

¶44. On July 11, 2016, the chancellor entered a final judgment that incorporated the factual findings and legal conclusions from her bench opinion. In dismissing Adam's petition with prejudice under Rule 41(b), the chancellor determined that Adam provided only assumptions and hearsay to support his claims, and she found such evidence insufficient to meet his burden of proof to show a material change in circumstances. The chancellor concluded that Adam failed to show Karen structured her relationship with Dobel so that they were committed to one another like a married couple, while remaining legally unmarried, to receive the benefit of alimony. The chancellor further found that Adam failed to show Karen

18

deliberately had avoided remarriage merely to continue to receive alimony. However, the chancellor issued no findings as to whether Adam met his burden of proof to show a material change in circumstances as a result of Karen no longer owing $10,000 a month in mortgage payments and the children all reaching the age of majority.

¶45. The chancellor also found that, although Karen could pay a portion of her attorney's fees, she presented sufficient evidence to entitle her to recover some of the money she expended in defending against Adam's petition. As a result, the chancellor ordered Adam to pay Karen $13,935.50, which amounted to one-half of her attorney's fees and expenses.

¶46. Rule 41(b) provides that "[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." When considering a dismissal based on the plaintiff's failure to show a right to relief, "the judge must consider the evidence fairly, rather than in the light most favorable to the plaintiff." *Pittman v. Pittman*, 195 So. 3d 727, 732 (¶12) (Miss. 2016) (citation omitted). "[T]he judge must deny the motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Presley v. Stokes*, 205 So. 3d 619, 622 (¶13) (Miss. Ct. App. 2016) (citation omitted). This Court will reverse a Rule 41(b) dismissal "only if the [chancellor's] findings are not supported by substantial evidence, or the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard." *Pittman*, 195 So. 3d at 732 (¶12) (citations omitted). However, this Court reviews questions of law de novo. *Id.*

¶47. Adam asserts that the chancellor erred by denying his request to terminate his periodic-alimony payments because the parties experienced a material change in circumstances that justifies the termination of periodic alimony. In support of his argument, Adam claims that Karen engaged in a de facto marriage and cohabited with Dobel. Adam further claims that Karen possessed substantial savings and investments, was well educated and capable of supporting herself, enjoyed a life of leisure without gainful employment, and the parties' children all had reached the age of majority.

¶48. In determining whether to modify a periodic-alimony award:

> [C]hancellors must first determine if an unforeseeable and material change in circumstances occurred since entry of the initial divorce decree. If not, modification is not permitted.
>
> However, if a substantial unanticipated change has in fact occurred, the chancellor should then consider the *Armstrong*[2] factors to determine the appropriate amount of alimony. In evaluating these factors when deciding whether to modify periodic alimony, chancellors should compare the relative positions of the parties at the time of the request for modification in relation to their positions at the time of the divorce decree. As with any alimony consideration, the chancellor must consider the wife's accustomed standard of living, less her own resources, as well as the husband's ability to pay.

*Peterson v. Peterson*, 129 So. 3d 255, 257 (¶¶7-8) (Miss. Ct. App. 2013) (internal citations and quotation marks omitted) (footnote added).

¶49. Adam argues that the chancellor erred by not terminating his periodic-alimony obligation because Karen and Dobel cohabit and are engaged in a de facto marriage. I find that the record contains substantial credible evidence to support the chancellor's determination that Adam failed to prove cohabitation and a de facto marriage between Karen

---

[2] *See Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

and Dobel. *See Pittman*, 195 So. 3d at 732 (¶12); *Coggins*, 132 So. 3d at 643 (¶29). However, although the record reflects no proof of cohabitation and no presumption of a de facto marriage between Karen and Dobel, the record does reflect that Adam presented sufficient evidence to survive a Rule 41(b) dismissal by showing his "right to relief" in the matter. *See Pittman*, 195 So. 3d at 732 (¶12).

¶50.   In *Martin v. Martin*, 751 So. 2d 1132, 1133 (¶3) (Miss. Ct. App. 1999), the divorce judgment ordered Ben to pay his ex-wife Linda $5,000 a month in periodic alimony. After the divorce, Linda sold the marital home "and built a 3,300 square foot house in an affluent neighborhood in Brentwood, Tennessee." *Id.* at (¶4). She also attended and graduated from law school in Nashville, and she became licensed to practice law in Tennessee in 1996. *Id.* While in Tennessee, Linda met Norm Anderson. *Id.* at (¶5). The two became involved in a long-term relationship and eventually got engaged. *Id.* Linda wore a diamond engagement ring from Norm, and the couple told friends they planned to marry "next year." *Id.* At the hearing on Ben's motion to modify alimony, Linda and Norm refuted any immediate plans to marry. *Id.* Linda "admitted, however, that she and [Norm] had not married because she need[ed] the financial support provided by the alimony [she] received from [Ben]." *Id.*

¶51.   Although Linda and Norm maintained separate residences, Norm had his own key and garage-door opener to Linda's home. *Id.* at 1133-34 (¶6). Though Norm occasionally spent the night at Linda's home, he ate regular meals there, ran errands for her, and performed yard work and other household tasks. *Id.* at 1134 (¶6). Linda and Norm vacationed together, spent holidays together, exchanged gifts, and attended church together. *Id.* Using his

21

employee discount, Norm purchased Linda clothing and cosmetics from the department store where he worked. *Id.* Meanwhile, Linda wrote checks to Norm over a three-year span that amounted to over $11,000. *Id.* Finding that Linda had engaged in a de facto marriage with Norm that allowed her "to receive the benefits of the relationship with some semblance of respectability and at the same time to continue her alimony payments from Ben[,]" the chancellor terminated Ben's periodic-alimony obligation. *Id.* at 1134 (¶8).

¶52. On appeal in *Martin*, this Court found substantial record evidence to support the chancellor's finding that Linda and Norm provided mutual support to one another through monetary gifts and in-kind services. *Id.* at 1136 (¶15). Furthermore, based on Linda's admission "that she and [Norm] had not married because she need[ed] the financial support provided by the alimony she receive[d] from [Ben,]" we affirmed the chancellor's finding that Linda "structured her relationship with [Norm] in an attempt to circumvent the appearance of cohabitation so as to continue her alimony[.]" *Id.* at (¶16).

¶53. In the present case, Adam presented sufficient evidence to survive a Rule 41(b) dismissal by showing his "right to relief" in the matter. *See Pittman*, 195 So. 3d at 732 (¶12). Specifically, Adam submitted sufficient evidence to show that Karen "structured her relationship with [Dobel] in an attempt to circumvent the appearance of cohabitation so as to continue her alimony[.]" *Martin*, 751 So. 2d at 1136 (¶15); *see also Wallace v. Wallace*, 12 So. 3d 572, 576 (¶19) (Miss. Ct. App. 2009) (in determining whether mutual support existed in contact of de facto marriage, the chancellor should consider "in-kind service contributions."). Since Adam presented sufficient evidence to survive dismissal under Rule

41(b), the proper remedy is to reverse the chancellor's dismissal and remand this case to the chancellor so that the trial may continue. *Pittman*, 195 So. 3d at 732 (¶12) (citations omitted) (We reverse a Rule 41(b) dismissal "only if the [chancellor's] findings are not supported by substantial evidence, or the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard.").[3] Since I would reverse the chancellor's judgment dismissing Adam's petition and awarding attorney's fees to Karen and remand this case for further proceedings consistent with this opinion, I respectfully dissent from the majority's opinion.

**LEE, C.J., IRVING, P.J., AND TINDELL, J., JOIN THIS OPINION.**

---

[3] *See also In re Adoption of D.N.T.*, 843 So. 2d 690, 711 (¶50) (Miss. 2003) (citing *Century 21 Deep S. Props., Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992)) ("In considering a motion to dismiss, the [trial] judge should consider 'the evidence fairly, as distinguished from in the light most favorable to the plaintiff,' and the court should dismiss the case if it would find for the defendant."); *Ladner v. Stone Cty.*, 938 So. 2d 270, 273 (¶10) (Miss. Ct. App. 2006).