# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01178-COA

RICHARD STOWE, JOY BARRET STOWE, LINDA DAVIS, GEOFFREY SCHEELE, AND MARGARET SCHEELE, INDIVIDUALLY AND AS HOMEOWNERS IN OAKMONT SUBDIVISION

APPELLANTS

v.

LARRY W. EDWARDS, PAMELA B. EDWARDS, AND EDWARDS HOMES INC.

APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 03/07/2019 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM P. FEATHERSTON JR. |
| ATTORNEYS FOR APPELLEES: | CECIL MAISON HEIDELBERG |
| | REEVE G. JACOBUS JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/01/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.**

**WILSON, P.J., FOR THE COURT**:

¶1.     Richard and Joy Stowe, Geoffrey and Margaret Scheele, and Linda Davis own homes in the Oakmont subdivision in Ridgeland. They filed a lawsuit in chancery court against Larry Edwards and Edwards Homes Inc.,[1] who developed the subdivision. They alleged that

---

[1] Larry Edwards's wife, Pamela Edwards, was also named as a defendant. However, she did not testify at trial, and the evidence indicates that she has relatively little to do with the issues raised by the plaintiffs' complaint. We will refer to Larry Edwards as "Edwards" and refer to Pamela specifically as necessary. For ease of reading, we will also refer to the defendants collectively as "Edwards" except when a distinction is necessary.

Edwards had improperly served as the president of the Oakmont Homeowners Association ("the HOA") since its inception in 1997 and had violated its covenants and bylaws by failing to call annual meetings and by increasing the HOA's annual assessment. The plaintiffs requested a declaratory judgment that all actions taken by Edwards since 1997 were void, and they asked the court to order Edwards "to refund or give credit" for allegedly improper assessments. They also asked the court to enjoin Edwards from taking any further actions as president of the HOA. Finally, they asked the court to appoint a receiver or trustee to act on behalf of the HOA and to call a proper meeting of the HOA. After a trial, the court ordered the HOA to hold a special meeting to elect new board members and officers, and the court directed the chancery clerk to preside over that meeting. However, the court denied the plaintiffs' claims for damages and other relief, finding that they were barred by the statute of limitations and the doctrine of waiver and that Edwards was not the proper party for their claims alleging improper assessments. The plaintiffs appeal. We find no error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. Larry Edwards is a real estate developer, homebuilder, and the president of Edwards Homes Inc. Around 1996, he acquired property in Ridgeland now known as the Oakmont subdivision. By that time, he had already developed "thousands" of lots and several other subdivisions throughout the State. Oakmont was the first subdivision he had developed that had a homeowners association at its inception. On March 14, 1996, Edwards filed with the chancery clerk a plat for Oakmont showing forty-five lots. At that time, the entire property and all of the lots were owned by Edwards Homes. Edwards testified that he borrowed

2

covenants used in other subdivisions, and he filed the Covenants, Conditions, and Restrictions for Oakmont ("the Covenants") with the chancery clerk in March 1997.

¶3. Under the Covenants, any person who buys a lot in Oakmont is a member of the HOA. The Covenants provide that the HOA shall hold an annual meeting each September to hear a report from the president and treasurer and elect directors. Edwards testified that one of the purposes of the Covenants was to manage the common areas of the subdivision.

¶4. On March 21, 1997, the HOA held its first meeting. Edwards was elected as chairman of the meeting and his wife, Pamela, was elected secretary. Edwards, Pamela, and W.W. Bailey, all of whom were directors of Edwards Homes, were "elected" as directors for the HOA. The minutes indicated that the directors were elected "to serve for the ensuing year, to serve until such time as their successors are duly elected and qualified." At a board of directors meeting that same day, Edwards was elected president of the HOA and Pamela was elected secretary. They likewise were "to serve for the ensuing year, to serve until such time as their successors are duly elected and qualified." Despite the requirement in the Covenants for an annual meeting each September, Edwards admitted at trial that he did not call for another HOA meeting until 2018. Edwards explained that he had continued to serve as president because it was his understanding that he and the other officers would serve until someone else was elected or qualified to serve as an officer. He did not have an explanation as to why he never called an annual meeting until 2018.

¶5. Edwards testified that from 1997 to 1999, there were no homeowners because the property was in its development stages. During that period, Edwards Homes paid all

expenses for the property. Edwards testified that between 2004 and 2008, Edwards Homes sold every available lot to either a third party or one of Edwards's other businesses.

¶6.     Edwards said that between 2006 and 2008, some Oakmont homeowners held informal meetings to discuss concerns with the HOA and to try to encourage more participation from homeowners. Edwards testified that at that time, the HOA's annual assessment of $900 per "Class A Member" (i.e., a lot owner other than the developer) was not sufficient to cover all maintenance costs and that Edwards Homes was still making contributions to cover the costs of the subdivision. The Covenants provide that Edwards Homes is a "Class B Member" of the HOA and that its contributions to the HOA are voluntary. Edwards said that he did not attend the homeowners' informal meetings because he was trying to let the homeowners make decisions without his interference or influence. He provided financial information to the group so they could see that income was insufficient to cover expenses. Following the informal meetings, no homeowner stepped up to take over leadership of the HOA, but they did create a new HOA budget and recommended increasing the HOA assessment to $125 per month (or $1,500 per year).

¶7.     In March 2008, Edwards sent all Oakmont homeowners a letter informing them of a necessary increase in the HOA annual assessment from $900 to $1,500. The Covenants provided for an initial maximum annual assessment of $900 but allowed for incremental increases or decreases when appropriate. Edwards testified that there were no significant complaints about the increase to the assessment until April 2018. He said that some homeowners, particularly the Stowes, had asked for refunds, but he explained that the HOA

4

could not refund every homeowner dating back to 2008 because the money had been used to maintain the common areas of the neighborhood.

¶8. Initially, the plaintiffs in this case all paid the increased annual assessment,[2] but in 2015 or 2016 the plaintiffs stopped paying their assessments in whole or in part. In the spring of 2018, Edwards received a letter from the Scheeles in which they alleged that the 2008 increase had been improper and requested a credit for their overpayment. By that point, the Scheeles were $3,500 in arrears on their HOA payments. Davis also sent a letter claiming that she had overpaid and asked to pay only a pro rata portion going forward.

¶9. Edwards testified that homeowners frequently complained about the maintenance of the common areas in the neighborhood. He said that some homeowners thought it was his responsibility as the developer to maintain all common areas. A provision in the Covenants required the developer to convey title to the common areas to the HOA. At trial, Edwards admitted that he had not transferred title to the pool and clubhouse common area to the HOA.[3] Edwards testified that he thought that title had transferred to the HOA automatically pursuant to the plat that he had filed with the chancery clerk. He said that he was ready and willing to sign a deed from Edwards Homes to the HOA.

¶10. Some homeowners also complained to Edwards about Oakmont Parkway, the main road in the subdivision. Edwards testified that the road needed to be resurfaced, and he estimated that it would cost approximately $141,000 to resurface the road. Edwards

---

[2] The Stowes had lived in Oakmont since 1999. Linda Davis had lived there since 2006. The Scheeles moved to Oakmont in 2010, after the 2008 increase in HOA dues.

[3] He had deeded another common area to the HOA.

5

explained that a gated subdivision can dedicate its streets to the City of Ridgeland for maintenance but that the subdivision must then allow public access to its streets. Edwards said that homeowners had discussed the issue in the past, but he thought "the consensus was they wanted to continue to maintain it as a private street."

¶11. In May 2018, some homeowners approached Edwards about holding an HOA meeting. A meeting was called and held on June 7, and owners of thirty-six of the forty-five lots were present or represented by proxy.[4] Edwards addressed questions he had received regarding the legality of the 2008 increase to the HOA assessment. Richard Stowe argued that the meeting had not been called properly, and he tried to stop it from going forward. However, another homeowner moved that any rules of order be suspended to allow the meeting to continue, and the motion was seconded and passed.

¶12. After "considerable discussion" of the 2008 assessment increase, a motion was made and seconded to "assess a Special Operating Assessment of $6,000 per lot owner/member effective immediately." The motion further provided "that the HOA shall give credit towards this Special Assessment for any portion of the $600 increase previously paid by the lot owner/member or previous lot owner/member since 4/1/2008." The motion also retroactively "ratified" the 2008 increase. The motion passed with twenty-seven votes in favor. At trial, Edwards explained that the special assessment was structured to require all homeowners who had stopped paying the full ($1,500) annual assessment to pay their arrearages while

---

[4] Edwards had a total of eighteen votes at this meeting because he and his businesses owned a total of seventeen lots at the time, and he received a proxy from one other lot owner. Edwards testified that he and his businesses paid annual assessments to the HOA on all of those lots—more than $25,000 per year—from 2008 forward.

homeowners who had been paying the full amount received full credit and did not owe any special assessment.

¶13.    During the June 2018 meeting, the homeowners also discussed repaving Oakmont Parkway.  After Edwards explained the estimated cost for the resurfacing project, thirty members voted to pass a separate special assessment of $3,500 to cover the cost of repaving. Edwards testified that the HOA board decided that if they did not receive enough money to pay for the repaving by a date certain, then the $3,500 special assessment payments would be returned in full.  The HOA did not receive enough money, so they returned the assessments and did not move forward with repaving.

¶14.    The final business at the June 2018 meeting was the nomination and election of new directors.  Edwards was reelected to the board, and at the September 2018 annual meeting, Edwards was reelected as HOA president.

¶15.    Linda Davis testified that she bought a home in Oakmont in 2006.  She is a certified public accountant and had examined some of the HOA's books and records.  She was concerned that the HOA had never been audited properly, which she thought was needed given Edwards's significant involvement in the HOA.  She also claimed that Edwards had failed to fix several problems in the subdivision. In 2018, Davis reviewed the Covenants for the first time and realized that they were not being followed.  At that time, she told Edwards that she would no longer pay the $1,500 annual assessment and would only pay $900.

¶16.    Joy Barret Stowe had been a homeowner in Oakmont since 1999.[5]  She testified that

_____

[5] Her husband Richard did not have a property interest in Oakmont until November 2018, when Joy granted him a life estate in her property.

7

she had never received an annual meeting notice until 2018. Stowe testified that she had paid her $900 annual assessment and then the increased amount of $1,500 for a time. When she discovered that the increase was improper, she stopped paying assessments altogether. She said that she had been concerned about the condition of the neighborhood, particularly the pool and clubhouse. She had taken her concerns to Edwards, but she did not think he had addressed them. She said that the issues should be addressed because "that is why I pay dues." However, she also said, "I'm not going pay any more until things are fixed because I feel like . . . [Edwards] owes me at this point. I don't owe him."

¶17. Stowe testified that she would have voted against the increase in dues at the June 2018 meeting, but she was not allowed to vote because she was in arrears. Stowe admitted that she had never tried to call an HOA meeting and that she and her husband tried to stop the June 2018 meeting from proceeding because they felt it was improper.

¶18. Geoffrey Scheele testified that when he bought a lot in Oakmont in 2010, he did not know that there were Covenants, but he knew that there was an HOA and that he would owe assessments. Like the other plaintiffs, he never received notice of any annual meeting or an opportunity to elect officers. He also felt that the neighborhood's pool and other common areas had deteriorated. In 2016, Scheele and others sent Edwards a letter about some of the issues in the subdivision. Edwards did not respond, and no meeting was called. Scheele stopped paying his HOA assessments around that time.

¶19. Scheele testified that he had sued the HOA in justice court to recover allegedly improper assessments. The justice court granted him a judgment for $1,865 against the

8

HOA, but the HOA appealed the case to county court, where it remained pending. In the meantime, Scheele and the other plaintiffs filed the instant lawsuit against Edwards in chancery court.

¶20. After the plaintiffs rested, Edwards moved for a directed verdict.[6] He argued, inter alia, that the plaintiffs' claims were barred by the statute of limitations and the doctrine of waiver. He also argued that the other homeowners had ratified his actions at the June 2018 meeting and that the plaintiffs had sued the wrong party by suing him rather than the HOA. The plaintiffs argued the statute of limitations had been tolled by Edwards's fraudulent concealment of his actions, to which Edwards responded that there was no evidence of fraud. The chancellor took the motion under advisement. The plaintiffs then moved to amend their complaint "to allege the elements of fraud." The chancellor denied that motion.

¶21. Edwards then called Wade Quin, who had been an Oakmont homeowner since 2014. Quin did not have any issue with the condition of the neighborhood or the HOA assessments. He attended the June 2018 meeting and was elected to the board of directors. He testified that employees of Edwards Homes had done a lot of the repair and maintenance work for the neighborhood, which was an "asset," as the HOA did not have to contract out for it. Quin testified that Edwards had spent money "out of his [own] pocket" to maintain Oakmont and that he had not found any evidence of financial malfeasance related to the HOA. Quin is also a property developer and was familiar with the type of covenants used by Oakmont. Quin

---

[6] A motion for a directed verdict is made only in a jury trial. In a bench trial, the proper motion is for involuntary dismissal pursuant to Mississippi Rule of Civil Procedure 41(b). *Lewis v. Lewis*, 269 So. 3d 230, 235 (¶13) (Miss. Ct. App. 2018).

said that everyone generally got along in the neighborhood and that most people were grateful to Edwards for serving as the HOA president.

¶22. Edwards also called Kent Barrett, who had enjoyed living in Oakmont since 2004. He had seen Edwards handle roadwork, maintenance, and landscaping. He acknowledged that there had been issues with maintenance in the past, but he was generally happy with the neighborhood. Barrett was part of the group of homeowners who met with Edwards in May 2018 about holding a general meeting. Barrett was also elected to the board of directors at the June 2018 meeting. Since the meeting, the board had solicited bids for maintenance of the common areas and repair of the clubhouse.

¶23. After the parties finally rested, the chancellor ruled from the bench. He denied the plaintiffs' request for declaratory relief, finding that they had not met their burden of proving that all of Edwards's actions as president of the HOA should be declared null and void. He also stated that he would decline to enter a declaratory judgment in any event because the relief requested to the plaintiffs would not help to bring an end to the controversy between the parties. *See* M.R.C.P. 57(a).

¶24. The chancellor did order that any common areas still titled to Edwards Homes should be deeded to the HOA within seven days. The chancellor also ordered the HOA to hold a special meeting within forty-five days for the purpose of electing a new board of directors. The chancellor directed the chancery clerk to preside over the election. The chancellor found that it would be inequitable to prevent homeowners from voting based on any current arrearage on their HOA dues; therefore, he ordered that all homeowners should be allowed

to vote at the special meeting. The chancellor also ordered that all of the HOA's financial records should be made available for inspection by any homeowner.

¶25. The chancellor denied the plaintiffs' claims for damages against Edwards and Edwards Homes. The chancellor found that the statute of limitations had run, that the doctrine of waiver barred the claims, and that Edwards and Edwards Homes were not the proper defendants for such a claim.

¶26. The chancellor subsequently entered written findings of fact and conclusions of law consistent with his ruling from the bench. The plaintiffs then filed a motion for reconsideration pursuant to Mississippi Rule of Civil Procedure 59, which the chancellor denied, and a notice of appeal.

**ANALYSIS**

¶27. On appeal, the plaintiffs raise five issues: (1) whether the chancellor failed to make sufficient findings of fact and conclusion of law; (2) whether the chancellor "erred as a matter of law" by holding that their demand for "a refund or credit of all [HOA] dues and assessments collected by [Edwards was] barred by the statute of limitations"; (3) whether Edwards waived his defenses of the statute of limitations, waiver, and estoppel because he did not seek dismissal on those grounds prior to trial; (4) whether the chancellor "erred as a matter of law by failing to rule in [their] favor . . . and grant the relief requested in [their] second amended complaint"; and (5) whether the chancellor erred by ruling that Edwards was not the proper defendant for the plaintiffs' claims.

¶28. We address these issues below, "keeping in mind that 'an appellate court employs a

11

limited standard of review in chancery matters.'" *Berlin v. Livingston Prop. Owners Ass'n, Inc.*, 232 So. 3d 148, 154 (¶16) (Miss. Ct. App. 2017) (quoting *Gaw v. Seldon*, 85 So. 3d 312, 316 (¶12) (Miss. Ct. App. 2012)). "The findings of the chancery court will not be disturbed when supported by substantial evidence unless the court abused its discretion, applied an erroneous legal standard, was manifestly wrong, or committed clear error." *Id.* (quoting *Singh v. Cypress Lake Prop. Owners Ass'n*, 192 So. 3d 373, 376 (¶11) (Miss. Ct. App. 2016)). "However, questions of law are reviewed de novo." *Gaw*, 85 So. 3d at 316 (¶12).

## I. Findings of fact under M.R.C.P. 52(a) were not necessary.

¶29. The plaintiffs filed a pretrial motion requesting findings of fact and conclusions of law pursuant to Mississippi Rule of Civil Procedure 52(a). On appeal, they argue that the chancellor failed to make sufficient findings of fact and conclusions of law.

¶30. Rule 52(a) provides that "[i]n all actions tried upon the facts without a jury, the court may, and shall upon request of any party to the suit . . . , find the facts specifically and state separately its conclusions of law thereon and judgment shall be entered accordingly." M.R.C.P. 52(a). The Advisory Committee Notes explain that "[g]eneral findings of fact and conclusions of law may technically comply with Rule 52's requirements despite a party's request for specific findings of fact and conclusions of law." *Id.* advisory committee notes (citing *Lowery v. Lowery*, 657 So. 2d 817, 819 (Miss. 1995); *Century 21 Deep South Props. Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992)). "If a trial court fails to make even general findings of fact and conclusions of law when specific findings of fact and conclusions of law are requested by a party, remand to the trial court may be necessary unless the evidence is so

overwhelming so as to make findings unnecessary." *Id.* (citing *Lowery*, 657 So. 2d at 819). The rule's "principal purpose" is to aid appellate review by "provid[ing] the appellate court with a record of what the trial court did—the facts it found and the law it applied." *Id.*

¶31. The plaintiffs' argument on appeal is without merit. Following the trial, the chancellor entered findings of fact and conclusions of law that, although not overly detailed, clearly stated the reasons for his rulings on the plaintiffs' claims. Furthermore, the plaintiffs' brief on appeal states—correctly—that "the facts of this case are not in dispute." There was no need for the chancellor to issue more detailed findings reciting historical facts that are not in dispute. The chancellor's findings of fact and conclusions of law clearly convey the basis of his decision and are sufficient for this Court to review that decision. In the context of this case, Rule 52(a) does not require anything more.

## II. The chancellor did not err by finding that the plaintiffs' demand for "a refund or credit of all homeowner's dues and assessments" was barred by the statute of limitations.

¶32. In the trial court, Edwards argued that the plaintiffs' claims for a refund or credit were barred by the applicable three-year statute of limitations[7] because they filed suit more than ten years after the alleged breach of the Covenants—the increase of the annual assessment from $900 to $1,500 in 2008. In response, plaintiffs' counsel argued that the statute of

---

[7] A claim for breach of contract is subject to a three-year statute of limitations. *See, e.g.*, *Robinson v. Singh*, 303 So. 3d 65, 74 (¶32) (Miss. Ct. App. 2020). Covenants are contractual in nature, and an action to enforce covenants is akin to a claim for breach of contract. *See Perry v. Bridgetown Cmty. Ass'n Inc.*, 486 So. 2d 1230, 1234 (Miss. 1986); *Berlin*, 232 So. 3d at 159 (¶33).

limitations was tolled by Edwards's "fraudulent concealment."[8]  However, the chancellor found that there was "no evidence of fraudulent concealment,"[9] and the plaintiffs have abandoned that argument on appeal.

¶33.    On appeal, the plaintiffs argue that their demand for "a refund or credit of all homeowner's dues and assessments" is not barred by the statute of limitations for a different reason.  They now argue that Edwards's failure to comply with the Covenants for twenty years constituted a "continuing breach of contract" that tolled the statute of limitations.  In response, Edwards argues that the plaintiffs waived this "continuing breach" argument by failing to raise it in the trial court.[10]  Finally, in their reply brief, the plaintiffs argue that they did not waive this argument "by failing to raise it in the trial court" because "the issue of law as to the application of the statute of limitations is reviewed de novo by this Court."

---

[8] The fraudulent concealment of a cause of action tolls the statute of limitations. Miss. Code Ann. § 15-1-67 (Rev. 2019); *Stephens v. Equitable Life Assurance Soc'y*, 850 So. 2d 78, 83 (¶18) (Miss. 2003).  However, the fraudulent-concealment doctrine does not apply unless the plaintiff proves that the defendant "engaged in affirmative acts of concealment" that were "designed to prevent" and actually did "prevent discovery of the claim." *Stephens*, 850 So. 2d at 83-84 (¶18) (quoting *Robinson v. Cobb*, 763 So. 2d 883, 887 (¶19) (Miss. 2000)).

[9] Indeed, the Covenants were filed in the chancery clerk's office, and the plaintiffs were aware of them.  In addition, Edwards's actions that are the subject of this lawsuit were all done openly.  Nothing was concealed.

[10] In addition, Edwards argues that the chancellor also relied on the doctrine of waiver and that we could affirm on that alternative ground.  In response, the plaintiffs argue that the chancellor erred by relying on the doctrine of waiver because the Covenants specifically provide that the failure to enforce a covenant shall not be deemed a waiver.  We decline to address the issue of waiver because we find no error in the chancellor's ruling on the statute of limitations.  We also concur with the chancellor that Edwards and Edwards Homes were not the proper defendants for this claim. *See infra*.

14

¶34. The application of the statute of limitations is indeed an issue of law that we review de novo. *See*, *e.g.*, *Townes v. Rusty Ellis Builder Inc.*, 98 So. 3d 1046, 1050 (¶8) (Miss. 2012). But the standard of review does not alter the "long-established rule in this state that a question not raised in the trial court will not be considered on appeal." *City of Hattiesburg v. Precision Constr. LLC*, 192 So. 3d 1089, 1093 (¶18) (Miss. Ct. App. 2016) (quoting *Adams v. Bd. of Supervisors of Union Cnty.*, 177 Miss. 403, 170 So. 684, 685 (1936)); *accord, e.g.*, *Triplett v. Mayor & Bd. of Aldermen of City of Vicksburg*, 758 So. 2d 399, 401 (¶9) (Miss. 2000) ("This Court has long held that it will not consider matters raised for the first time on appeal."). When we say that our standard of review is "de novo," that simply means that "this Court sits in the same position as did the trial court" and that we do not defer to the trial court's ruling. *R.J. Reynolds Tobacco Co. v. King*, 921 So. 2d 268, 270-71 (¶10) (Miss. 2005); *accord, e.g.*, *Jackson v. Payne*, 922 So. 2d 48, 51 (¶5) (Miss. Ct. App. 2006). If we "sit in the same position as the trial court," we will not consider issues or arguments that were never presented to the trial court. Accordingly, consistent with our usual and well-established rule, the plaintiffs' "continuing breach" argument is waived because they failed to raise it in the trial court. Therefore, the plaintiffs have failed to identify any reversible error in the trial court's application of the statute of limitations.

### III. Edwards did not waive his defenses.

¶35. The plaintiffs next argue that Edwards waived the affirmative defenses of the statute of limitations and waiver by failing "to timely and reasonably raise and pursue the enforcement of said affirmative defenses prior to trial." Therefore, they argue that the

chancellor erred by finding that their claims were barred by those defenses.

¶36. A defendant must plead affirmative defenses, including the statute of limitations and waiver, in its answer. M.R.C.P. 8(c). Our Supreme Court has also held that "[a] defendant's failure to timely and reasonably raise and pursue the enforcement of any affirmative defense or other affirmative matter or right which would serve to terminate . . . the litigation, coupled with active participation in the litigation process, will ordinarily serve as a waiver." *MS Credit Ctr. Inc. v. Horton*, 926 So. 2d 167, 180 (¶44) (Miss. 2006) (footnote omitted).

¶37. In this case, the plaintiffs filed their original complaint on September 19, 2018, and filed an amended complaint on September 24, 2018. On October 22, 2018, the court entered an agreed order setting the case for trial on January 30, 2019—i.e., about four months after the complaint was filed. Edwards then timely filed his answer on October 26, 2018, and asserted the statute of limitations and waiver as affirmative defenses. Thus, Edwards clearly satisfied the pleading requirement of Rule 8(c).

¶38. The plaintiffs filed motions to amend their complaint on December 12, 2018, and January 22, 2019. On January 28, 2019—two days before trial—the court ruled on the plaintiffs' motions, granting one in part. The next day, the plaintiffs filed their second amended complaint. Trial then began as scheduled the following day, and Edwards again raised his affirmative defenses of the statute of limitations and waiver when he moved to dismiss at the close of the plaintiffs' case-in-chief.

¶39. While a party may sometimes waive a defense by engaging in protracted and unnecessary pretrial litigation and discovery, that did not occur in this case. Rather, no

depositions were taken, and by agreement the case proceeded quickly to trial. Under these circumstances, Edwards did not waive his affirmative defenses by pleading them in his answer and then litigating them at trial three months later.

**IV. The plaintiffs fail to show that the chancellor "erred as a matter of law" by denying them the relief they requested.**

¶40. In their fourth issue on appeal, the plaintiffs assert that the chancellor "erred as a matter of law by failing to rule in [their] favor . . . and grant the relief requested in [their] second amended complaint." However, the plaintiffs' opening brief devotes only two sentences to this issue. Moreover, the plaintiffs fail to specify how the chancellor erred, and they fail to make any meaningful argument in support of their bare assertion of error. Accordingly, the plaintiffs waived the alleged error and failed to meet their burden of showing reversible error. *See Doss v. Claiborne Cnty. Bd. of Supervisors*, 230 So. 3d 1100, 1104 (¶10) (Miss. Ct. App. 2017) ("In the absence of meaningful argument and citation of authority, an appellate court generally will not consider an assignment of error. A cursory argument without further reason or explanation is inadequate." (citation, quotation marks, brackets, and ellipsis omitted)); *Concerned Citizens of Raven Wood Subdivision v. Pearl River Cnty.*, 172 So. 3d 1234, 1236 (¶10) (Miss. Ct. App. 2014) ("It is axiomatic that the trial court's judgment is presumed to be correct and that the appellant bears the burden of showing reversible error in the court below.").

**V. The chancellor correctly ruled that the plaintiffs failed to sue the proper defendant.**

¶41. Finally, the plaintiffs argue that Edwards should be held personally liable for

violations of the Covenants. On appeal, they argue that the chancellor should have "pierced" the HOA's "corporate veil" in order to reach Edwards personally. *See generally Gray v. Edgewater Landing Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989) (summarizing the three elements of a veil-piercing claim under Mississippi law). However, the plaintiffs failed to raise a veil-piercing claim in their complaint or at any point in the proceedings in the trial court. Therefore, the issue is waived. *See supra* ¶34.

¶42. Procedural bar notwithstanding, we concur with the chancellor that Edwards was not the proper defendant for the plaintiffs' claims for damages. The plaintiffs paid assessments to the HOA, not to Edwards. They could have sued the HOA for any alleged improper assessments. Indeed, as noted above, Scheele testified that he had sued the HOA in justice court. Scheele testified that he chose to sue the HOA in justice court precisely because he "knew" that if he "tr[ied] to sue [Edwards]," the case "would get thrown out immediately" on the ground that Edwards "is not the [HOA]." In the alternative, if the plaintiffs believed that Edwards had committed some wrong against the HOA, they could have followed the proper procedures to attempt to pursue a derivative claim against Edwards on behalf of the HOA. *See* Miss. Code Ann. § 79-11-193 (Rev. 2013).[11] Instead, however, the plaintiffs attempted to sue Edwards directly to recover money that they paid to the HOA. We agree with the chancellor that the plaintiffs have no viable claim for such a recovery against Edwards or Edwards Homes.

---

[11] We do not imply that the plaintiffs would have had a viable derivative claim. They presented no evidence that Edwards used HOA funds for any improper purpose or did anything else to harm the HOA. They only complain that the assessments they paid to the HOA were improper.

**CONCLUSION**

¶43. Because the plaintiffs have failed to demonstrate any reversible error, the judgment

of the chancery court is **AFFIRMED**.

     **BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**